ALEXANDER PATNODE vs. WARREN COTTON MILLS.

Hampden.     September 27, 1892. — October 21, 1892.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Master and Servant — Minor — Due Care — Negligence.*

In an action for personal injuries occasioned to a boy fourteen years old by having his hand crushed between the rolls of a lap-winder in the defendant's cotton mill, it appeared that he had been employed in the mill for about three weeks, not having worked in a mill before, but that he was not hired to work upon the lap-winder, although it was in his sight when at his work, and he had noticed how it operated; that he was hired to mind the cards, mend broken ends, keep the cards clean, and the floor clean around four sections; that he was told by the overseer of the room to attend to that work and to no other; and that he was injured while assisting a workman in doubling the laps, who called him to do so, and who had always called some one to his assistance for that purpose, but had always called a man previously. The evidence was conflicting whether the workman was the second hand of the room, or merely a card-grinder, and so a common laborer; and whether he gave the plaintiff any instructions. There was also evidence that the plaintiff was not very smart, and was rather dull; and that he did not respond to the workman's call until called three times, the last time with an oath. *Held,* that the questions whether the plaintiff was improperly at the lap-winder when injured, and whether he was in the exercise of due care and the defendant was negligent, were for the jury.

If the overseer of a room in a mill imposes upon a workman labor which it is impossible for him to perform without assistance, and knowingly acquiesces in his obtaining the assistance from such other workmen in the room as he chooses to call, and the workman in good faith, and for the purpose of performing such labor, though not in the exercise of good judgment, orders a boy to assist him who is unfit by reason of inexperience and lack of instruction, and who, while rendering such assistance, is injured, the owner of the mill stands in the relation of master to the person injured.

Where a workman in a mill is injured by having his hand caught in a machine, the running of which is stopped promptly, and before his hand is released another workman starts the machine for the purpose of extricating the injured hand, and not in the prosecution of his work, although the act is careless and causes further injury, the employer, if liable for the original injury, is liable also for the aggravation of the injury.

BARKER, J.   The plaintiff seeks, at common law, to recover for an injury received while in the defendant's employ. His hand was crushed between the rolls of a lap-winder, then in use for doubling laps. The machine had a long platform about two and a half feet wide, on which ran a layer of carded cotton of about the same width, passing between two iron rolls

into a box at the end of the machine. The rolls were about six inches in diameter and two and a half feet in length, set closely together, one above the other, making thirty or forty revolutions per minute, and the under roll was covered, except at each end, by the lap passing between them. When used for doubling, a second lap, so wound as to form a cylinder a foot and a half in diameter and weighing some thirty pounds, was placed in slotted standards rising from each side of the platform at some distance from the rolls, and the end of this lap carried down on the side farther from the rolls to the other lap, and its end joined to that lap, so that the two would pass together along the platform and between the rolls. The height of the platform above the floor, and of the standards above the platform, and the space between the standards and the rolls, were in dispute.

At the time of the injury the plaintiff was fourteen years of age, and at the time of the trial nineteen. He was himself a witness. There was some evidence, which read in the bill of exceptions seems slight, but the weight of which, it having been admitted, was for the jury, (see *Ciriack* v. *Merchants' Woolen Co.* 151 Mass. 152, *Leistritz* v. *American Zylonite Co.* 154 Mass. 382, 384, and *Connors* v. *Grilley*, 155 Mass. 575,) that he was not very smart, and was rather dull. He had never worked in a mill before his employment by the defendant, which was about three weeks before his injury, and before his employment he knew nothing of such work. He was not hired to work upon the lap-winder, but it was in his sight when at his work. The evidence tended to show that he was hired to mind the cards, mend broken ends, keep the cards clean, and the floor clean around four sections; and that he was told by the overseer to attend to that work, and not to attend to any other. There was no dispute that he received sufficient instructions as to the work which he was hired to do. He himself testified that the lap-winder was at the end of the cards, and that he noticed it when he was at work upon the cards, and how it operated, and what it did, and knew about the laps running along and running between the rolls, and that the end of the lap which was put into the standards would roll down until it came in contact with the one on the platform, and that they then went together between the rolls.

In the room were an overseer, a second hand, and some twenty employees. Among the latter were two card-grinders, James McKeon, and another who was away on the day of the injury. One employee attended to the lap-winder, when used for its ordinary purposes; but, when used to double laps, James McKeon testified that it was his duty to get the second lap in place. To do this required assistance. He testified that he had been in the habit of calling the lap-winder man to help him, and, if he did not come, the other card-grinder, if he was there; and, if he did not find the card-grinder, somebody else. That he had to double laps once or twice a week, and could not tell how many different persons he had called on to help him do that work; but he did not know that he had called on any one but the lap-winder man and the card-grinder, and he had always called on a man before. The overseer, however, testified that it was the business of the two card-grinders to put the laps on when they were to be doubled, and that he instructed them to do so; and that, in the absence of one of the two, the other would generally take the man that ran the lap-winder, who was supposed to help when no one else could be got; and, upon cross-examination, the overseer further testified that, if James McKeon found the tender of the lap-winder gone, he would have to call on somebody else to help with the doubling. The overseer also testified that a card-grinder keeps the cards in repair, and has no one under him, but has his own work to do; but the treasurer of the mill testified, " We consider a grinder a little better than a common hand."

The circumstances attending the injury were in dispute, and the evidence was conflicting. It was in dispute whether James McKeon, who called the plaintiff to come to the lap-winder and help, was then the second hand of the room, or was merely a card-grinder, and so a common laborer. The plaintiff testified that the lap broke, and that James McKeon told him to piece it up, and that while he was doing so his hand was caught; while McKeon testified that there was no breaking of the lap, and no order to piece it up. The plaintiff testified that James McKeon gave him no instructions; while McKeon testified that, when the plaintiff put the lap down in the standard, he told him, " Now keep away from the rolls, keep your hands away from those

rolls." It was contended in behalf of the plaintiff, that, when he held the lap in his left hand, it came between his eye and the rolls, so that he could not see the rolls. The exceptions show no direct testimony to this effect, nor to the contrary; and whether the jury so found must have depended upon the inferences of fact which they may or may not have drawn from the evidence. It cannot be said, as matter of law, that the contention was not correct. In addition, as before stated, the height of the platform and of the standards, and the distance of the latter from the rolls, were in dispute. After the plaintiff's hand was caught, the machine was promptly stopped by James McKeon; but before the hand was released, it was again started by the lap-winder man; and the defendant contended that the injury was thus aggravated. Whether the machine was so started in the prosecution of work, or with a mistaken purpose of rescuing the plaintiff, was in question.

The evidence tended to show that James McKeon was doubling laps, and that, the other card-grinder being absent, he called the tender of the lap-winder to help him in putting a lap in the standards. This man not coming, McKeon called the plaintiff to come over and help him. The plaintiff was at work at the cards, and did not comply. McKeon called him a second time, and he remained at his own work; McKeon then, with an oath, called him a third time; whereupon the plaintiff left his work and went to help McKeon. McKeon, standing with the rolled lap on one side of the lap-winder, and the plaintiff opposite on the other side, passed to him one end of the rolled lap, directing him to put the end of a stick passing through it into the slot in the standard, and the plaintiff did so. The plaintiff testified that, after the lap had been so placed, he saw it run off, and that then McKeon passed him another lap, and that his end of this lap fell and broke, and that McKeon directed him to piece it, in attempting to do which his hand was caught by the rolls. McKeon testified that he remembered the placing of but one lap with the plaintiff's help, and, as above stated, denied that the lap fell or broke, and that he ordered the plaintiff to piece it.

1. It is plain that a verdict for the defendant could not have been ordered on the ground that the plaintiff was improperly at the lap-winder. There was evidence for the jury that James

McKeon, whose orders to help at the work on that machine the plaintiff obeyed, was the second hand of the room, and that therefore the plaintiff was under his authority. Even although the plaintiff would have been justified in refusing to obey the order if McKeon was second hand, and so in authority, the plaintiff might submit to McKeon's direction; and if so, it would not be open for the defendant to say that he was not properly at work. The weight of the evidence may have been strongly in favor of the conclusion that James McKeon was not second hand, but it was a question for the jury.

2. Whether a verdict for the defendant ought to have been ordered on the ground that the plaintiff, in placing his hand in a position to be caught between the rolls, incurred without necessity a known and obvious danger, which he must be held to have had the means and capacity of appreciating, and so was injured by his own carelessness, is a difficult question. Persons of his age and of ordinary understanding, who have for three weeks been familiar with the operation of such machinery as that upon which the plaintiff was employed, must be taken to know that the hand will be injured if allowed to come between revolving wheels, such as the plaintiff had seen in operation upon the lap-winder, and by which he was hurt. *Henry* v. *King Philip Mills,* 155 Mass. 361. *De Souza* v. *Stafford Mills,* 155 Mass. 476. *Rood* v. *Lawrence Manuf. Co.* 155 Mass. 590, and cases cited. The defendant contends that numerous cases in which a similar doctrine has been applied by this court govern the case at bar. In *Moulton* v. *Gage,* 138 Mass. 390, the dangers were of a different class, but the fact that they were obvious was held to authorize a verdict for the defendant, the plaintiff being a man of the age of twenty-five years, and of ordinary physical and mental capacity. In *Crowley* v. *Pacific Mills,* 148 Mass. 228, the plaintiff was about seventeen years old, and had been employed in mills for five years, and it was held that he could not recover for an injury sustained in consequence of putting his finger between a roll and a cylinder, each of which was revolving, the roll serving to hold against the cylinder a piece of cloth, from which he was smoothing a wrinkle. In *Probert* v. *Phipps,* 149 Mass. 258, the plaintiff was a boy of fifteen, as to whose capacity the case is silent. He was hurt

only twenty-one days after he began to work. But it appeared that he had worked for over a year in the business of making fire-works, in which he had to be very careful, and that his father was a machinist employed in machine works where he had visited him, and that on these visits he had kept away from revolving wheels, because afraid he might get caught if he went too near. He was injured by the catching of his clothing in a rapidly moving gearing, of whose position and nature he was well aware; and the ordering of the verdict against him was held right, because it appeared from his own testimony "that the danger of getting caught in the gearing was obvious, and that he well understood what this danger was, and how it was to be avoided." In *Coullard* v. *Tecumseh Mills*, 151 Mass. 85, the plaintiff was over fifteen years of age, and of ordinary intelligence, had been at work for several months on machinery of various kinds, and for two and a half days on the picker by which he was hurt. He knew all the elements of danger, and also how to avoid them, and for these reasons the defendant's exceptions were sustained. In *Pratt* v. *Prouty*, 153 Mass. 333, the plaintiff was about sixteen years old, and of at least ordinary intelligence, and had been warned that, if he got his fingers between the two slowly revolving cylinders of a skiving machine, he would get hurt, and he knew that if he put his fingers where the leather went they would be caught; and for these reasons there was no evidence to warrant the verdict which the jury returned in his favor. In *Tinkham* v. *Sawyer*, 153 Mass. 485, the plaintiff was over sixteen years of age, and at least of ordinary intelligence; had been attending wool cards for a month, and for parts of two days the wool-picker, by falling into which he was injured. He had been repeatedly told that the picker was dangerous, and not to touch it while in motion. He testified that he knew it was dangerous when in motion, and he had helped to clean it a number of times. On these facts, the court held that a verdict for the defendants was rightly ordered. In *Leistritz* v. *American Zylonite Co.* 154 Mass. 382, the plaintiff was eighteen years old, of such apparent intelligence that the question whether he was above or below the average intelligence of a boy of his age was properly excluded, had been at work in the mill some eight months, and

was injured by placing his hand between revolving rollers which were entirely open to observation, and which he testified he knew would draw in his fingers. In all these cases it appeared, without contradiction, that the danger was not only obvious, but actually known to the person injured, who in each case was conceded to be of at least ordinary intelligence, and was in fact of greater age and more experience than the plaintiff in the case at bar. Besides these considerations, there was, in the present case, the possibility that it was fairly to be inferred from the evidence that the lap itself concealed from the plaintiff's vision the rolls by which he was hurt, at a stage of his work almost immediately preceding the injury, and that the final order which he obeyed was accompanied by an oath which may have had a tendency to confuse him. In this state of the evidence, we are of opinion that the presiding justice was justified in leaving to the jury the question whether the plaintiff was in the exercise of due care. The same state of the evidence made it competent for the jury to find a want of due care on the part of the defendant, in putting the plaintiff to do the work in which he was engaged, without warning of the danger and without instruction how to avoid it. The same considerations dispose of the fourth and fifth rulings requested by the defendant; for, if the jury should find that the plaintiff was at the lap-winder in obedience to an order for which the defendant was responsible, and that by reason of apparent youth, inexperience, or dulness he was in need of warning and instruction, and was not warned or instructed, this would be negligence on the part of the defendant. *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572. *Sullivan* v. *India Manuf. Co.* 113 Mass. 396, 399. *Rock* v. *Indian Orchard Mills,* 142 Mass. 522, 529. *Ciriack* v. *Merchants' Woolen Co.* 146 Mass. 182, 190, and 151 Mass. 152. *Crowley* v. *Pacific Mills,* 148 Mass. 228. *Probert* v. *Phipps,* 149 Mass. 258.

3. The defendant requested three rulings upon the question whether the plaintiff was at the lap-winder under such circumstances as to render the defendant liable for an injury resulting therefrom. Of these, the third could not be properly given, because, as we have seen, there was evidence that James McKeon was second hand, and in authority over the plaintiff. The presiding justice was not bound to give the first and second in

terms, and, if the instructions on this branch of the case were sufficient and correct, the exceptions relating to it must be overruled. The instructions were certainly sufficiently full, covering all the aspects of the evidence, and we are of opinion that they were correct.*

---

* The instructions were as follows: "I do not know that there is any evidence in the case that the overseer did by words appoint James McKeon second hand, or by words clothe him with any authority other than that of an ordinary servant or laborer. The second way in which James McKeon might get this authority would be from being allowed to exercise it in the mill, and in the presence and with the knowledge of the overseer. I assume, for the purposes of this case, and believe it to be the law, that upon such a matter the overseer had the power, according to the evidence without dispute, to clothe James McKeon with this authority, if he distinctly and specifically desired to do so, by appointment. He would also have power to invest him with authority indirectly; that is, by allowing him to exercise it, knowing that he exercised it, and making no objection. Upon such a matter as that, by virtue of his position, he would represent the defendant corporation, and, under the law, they might clothe him with authority by allowing him to use it with their knowledge, without objection from themselves, or from the overseer representing them. . . . Bearing in mind that the burden of proof is upon the plaintiff, taking all the evidence of the plaintiff, has the plaintiff satisfied you by a fair weight of the evidence that James McKeon at and before the time of this injury was in the exercise of this power and control over the plaintiff and other servants, and that it was known and acquiesced in by the overseer? If he was, then you would be warranted in finding that he had this authority with reference to calling upon the boy. . . . If James McKeon had the right, by virtue of the business he was set to do, to call men to his assistance, and, in the honest prosecution of the work that had been assigned him, and with an honest intention to carry it out, called upon the plaintiff to assist him, although he had not judged wisely in doing so, although he may not have done exactly what the defendant intended him to do, yet if he was acting in good faith, intending to carry out and perform a duty which had been assigned him, and he did what he did in the honest exercise of his judgment, and so called upon the plaintiff, and the plaintiff in obedience to that call, went to his assistance, it must be taken for the purposes of this case that the defendant would be responsible for that call. . . . If his authority is shown by a fair weight of the evidence in either of these two ways I have spoken of, and if the plaintiff went to that machine in response to his call then it is to be taken at this point that the plaintiff was properly at the machine, and unless you are satisfied of James McKeon's authority in one of these two ways to which I have referred, and that the plaintiff went in response to his call, then the defendant is not responsible to the plaintiff for his being at the lap machine, and is not responsible for the injury that he suffered."

For some purposes the overseer of the room was the representative of the defendant, and could in that room confer authority both directly and indirectly. If he knowingly acquiesced in the giving of orders by James McKeon to other workmen, that was tantamount to conferring upon him authority so to do; and so would be his imposing upon James McKeon of work which it was impossible for him to do without help, and allowing him to obtain assistance as he chose. James McKeon was doing the defendant's work in the ordinary manner, and in good faith took an obvious and natural means of forwarding the master's work in calling the plaintiff to help him. If the plaintiff complied with the order, the defendant would stand to him in the relation of a master, although James McKeon might have acted negligently in calling upon him, and might not have made a wise selection, or have done what the overseer or the defendant intended. The usual doctrines of agency would govern the case, and the jury were properly so instructed.

The instructions with reference to the starting of the machine after the plaintiff's hand was caught were sufficiently favorable to the defendant.*

*Exceptions overruled.*

*C. L. Gardner*, for the defendant.
*G. M. Stearns & J. H. Loomis*, for the plaintiff.

---

\* The instructions were as follows: " There has been some evidence tending to show that after this boy's hand got caught, and got injured to some extent, the machine was stopped, and then that a fellow laborer, hearing the outcry, did something to the machine which, instead of stopping it, started it up again, and the boy's hand was drawn farther in and injured further. Now the question is, What responsibility would the defendant have with reference to that? If the defendant is liable at all, my view of that is this: that if what this servant did he did in the way of prosecuting his work as a servant, however careless it might be, it would be the carelessness of a fellow servant, and the defendant would not be responsible for it. If, on the contrary, what he did he did because he heard this cry of distress, and not with reference to his ordinary labors as a servant, but for the purpose of relieving the plaintiff, whom he supposed was being hurt, and did it with that intention and for that purpose, although his action was a careless action, as it turned out, I think the defendant may be responsible for that, if the defendant is responsible in the case."