MARY CONNOLLY *vs.* MARCELLUS ELDREDGE & others.

Suffolk.   December 5, 1893. — March 1, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Personal Injuries — Master and Servant — Dangerous Machine — Action.*

A woman was injured by having her hand caught between the rollers of a steam ironing machine in a laundry, where she had worked for several weeks. She was familiar by observation with the operation of the machine. The upper roller was covered with white cloth and was directly above the lower roller, which was larger, of iron, and hot, and the rollers were in contact with each other; there was a horizontal shelf in front of the point of contact of the rollers, and across the shelf was a rod used as a guard, under which, in operating the machine, the articles to be ironed were slid. When injured, the woman was putting a new cloth covering on the upper roller, over the guard, by direction of her superior, but without special directions. *Held,* in an action against her employer for her injury, that the elements of danger were obvious, and required no instructions to make them appreciated; and that the action could not be maintained.

TORT, for personal injuries occasioned to the plaintiff by having her hand caught between the rollers of a steam ironing machine, known as a "mangle." Trial in the Superior Court, before *Bishop,* J., who allowed a bill of exceptions, in substance as follows.

There was evidence tending to show that the plaintiff was employed by the defendants to starch articles of clothing in a laundry in Boston, and that she had worked in the laundry some three or four weeks before she was injured. The plaintiff testified that, up to the day of the injury, her work had been to

do starching; that in this work she used no machine, and had nothing to do with any machine until the day she was hurt; that a person called the head laundress, who was an employee of the defendants, directed the plaintiff as to her work and the manner of doing it, as well as gave the directions to the other employees; that the plaintiff's usual place of work was behind the mangle and about five feet from it; that she could see the clothes coming out through the mangle; that, when she first came to the laundry, she was curious about the machinery, and watched it with interest; that she watched the operator who fed it, and saw how it was operated; that she had used the mangle for ironing handkerchiefs and napkins; that she had used it half a dozen times to put things through; that she put them in just as the operator did; that she sometimes stood beside her and put in small articles, while the operator put in large articles; that on the day of the accident she was told by the head laundress to go to work at the mangle; that the former operator had gone away on the day before; that the plaintiff went to work as directed, at about seven o'clock in the morning; that she was given no direction whatever as to the work, except to go to work at the mangle; and that she put through articles of clothing, as she had seen the former operator do.

The plaintiff, with the aid of a wooden model, described the mangle. It was about five feet long, and of such height that the plaintiff could see over it. It consisted of two rollers, the lower twenty to twenty-four inches in diameter, of iron, and hot; the upper, six to eight inches in diameter, and covered with white cloth; the upper roller was directly above and in contact with the lower. Behind the upper roller were two more rollers, also in contact with the large roller. There was a horizontal shelf about a foot in breadth directly in front of the point of contact of the upper and lower rollers. This shelf was about the height of the operator's waist. Below this shelf was a trough or box to hold articles of clothing before they were fed into the mangle. The power was steam, and was regulated by a foot-pedal near the floor, and at the centre of the machine. Across and upon the shelf, and just in front of the point of contact of the rollers, was a round metal rod about an inch in diameter, called the guard. An article such as a

sheet or towel could be pushed under this guard, and upon the rollers. There was a space between the guard and the cloth-covered roller. The rollers, shelf, and guard extended across the entire width or front of the mangle. In operating the machine, the article to be ironed was pushed under the guard and allowed to be drawn between the rollers. In doing this, the operator placed her hands on the article so as to hold it smooth and without wrinkles, both when started and when being drawn in. Articles came out from the rolls upon a shelf at the back, and were always put through more than once in order to dry them completely.

The plaintiff further testified that, in operating the machine, it was necessary for her fingers to go quite close to the rollers; that the ends of her fingers often touched the guard, which prevented them from being caught by the rollers; that at about two o'clock on the day of the accident the mangle stopped, and the engineer was called to repair it; that when he left it it was noticed that the white cloth upon the upper roller was soiled; that the head laundress then requested the plaintiff to assist her in putting a new covering cloth upon this roller; that the old cloth was first torn off the roller, as it could not be unrolled; that under this cloth was a soft cloth of felting, which was not removed; that the head laundress then brought a new piece of white unbleached cloth as wide as the roller and long enough to go round the roller more than once; that it was put upon the roller by being rolled in as the clothes were, except that it was put on over the guard; that the only direction given the plaintiff as to the way in which she was to assist was that she should hold it tight and smooth and not let it wrinkle; that the plaintiff held the right end of the cloth with her right hand, and with her left hand she held the cloth nearer the middle of the mangle; that the head laundress in the same way held the left end of the cloth; that the cloth was in this way rolled on once, but there were wrinkles in it at the plaintiff's end; that the head laundress directed the plaintiff's attention to these wrinkles, and said, " Take it right off and put it on different"; that she spoke rather sharply, and told the plaintiff to put it on the best she could, telling her to keep it tight and not let it wrinkle; that the machine was reversed, and by this means the

cloth was wholly or partly unwound; that the plaintiff assisted in unwinding it; that the plaintiff again took hold of the cloth as before; that the cloth was again being wound on over the guard in the same way as before, when the plaintiff's left hand was caught between the rollers and injured; that the plaintiff was holding the cloth with the back of her hand uppermost, the fingers being above the cloth and the thumb under it; that no warning or direction was given to the plaintiff except as stated; that the plaintiff was at the time of the accident twenty years of age; that she had lived on a farm in Ireland until within two years of the accident, when she came to this country, and from that time until employed by the defendants she had done house-work in private families; that she had never seen or used any machinery except as described above; that on the day she was hurt there was a larger amount of work to be done than usual, and the work was being hurried, and the other girls and head laundress were at work; and that she worked upon the mangle on the day of the accident from seven o'clock in the morning until two o'clock in the afternoon.

On cross-examination, the plaintiff testified that she did not know whether she or the head laundress controlled the power of the mangle while the roll was being covered, she did not remember herself doing it; that she did not see that her fingers were likely to be caught; that she knew there was pressure between the rollers on the clothes to iron them as they went through the mangle; that she thought that her fingers could not get caught as the clothes were; that the guard would keep her fingers from getting caught; that, if her fingers were touched, she could snap them right out again; that she knew she could snap them out, and that, if she did not, they would be injured; that she could always see, when she was in the room, that the rollers worked; that she had stood by the head laundress, or the person who operated the mangle, and saw it work; that she saw some one at work there every day; that the mangle started and stopped by a treadle, and she stopped and started the mangle during the day, as she wanted; that there was a window back of the machine, and it was light; that when she was putting on the cover she was looking right at the cloth and her fingers, and saw them go right up to the place

where the cloth was going in; that the head laundress never told her how to work the mangle; that she felt that she could put things into the mangle, and she did not ask for any instructions; that when she was putting on this covering she knew that the cloth was being pulled over the guard, and she kept her eyes right on the cloth all the time as well as she could; that it went up. quite slowly; that she was holding on to it to keep the wrinkles out of it; that she saw the rollers pulling in the cloth; that she had seen the cloth put on once before on the day she was injured; that she knew that these rollers were hot; that when this covering was going on over the soft cloth she knew it had to be put on over the guard so it would roll up on the roller; that she understood also that the rollers caught the cloth and pulled it in, and she understood the power of the rollers that drew the material in; that she knew that the heat of the rollers would dry the cloth; that she stood by the head laundress and watched how she held her hands when she was putting things into the mangle; and that, on the day of the injury, the plaintiff held her hands exactly as she had seen the head laundress hold her hands when she used the mangle.

On the foregoing evidence, the judge ruled that the plaintiff could not maintain the action; and directed a verdict for the defendants. The plaintiff alleged exceptions.

*J. Prentiss*, for the plaintiff.

*E. R. Anderson*, for the defendants.

HOLMES, J. The danger to fingers from two cylinders in contact with each other, and seen to be revolving inwardly, is obvious to any person of ordinary powers, and plainly was understood by the plaintiff. *Crowley* v. *Pacific Mills*, 148 Mass. 228. In *Patnode* v. *Warren Cotton Mills*, 157 Mass. 283, 289, it might have been found that the plaintiff could not see the revolving rolls by which he was hurt. In the present case, if there had been no guard across the shelf of the mangle, the plaintiff would have acted at her peril. But the guard did not convert the mangle into a trap. It manifestly was not intended to protect the hand except in the ordinary use of the mangle, when clothes were slid under the guard. The plaintiff was putting a cloth upon the cylinder, above the guard. She saw, or might have seen, all the elements of danger, including the

distance between the guard and the cylinder on that side.  To appreciate them required no warning or instruction beyond what is furnished by common experience.

*Exceptions overruled.*