## BUTLER v. FRAZEE*

MASTER AND SERVANT; DEFECTIVE APPLIANCES; NEGLIGENCE; CONTRIBU-
TORY NEGLIGENCE; ASSUMPTION OF RISK.

1. While it is the duty of an employer to provide suitable and reasonably safe machinery and appliances for the use of his employees, and this

*Master and Servant—Duty of Master.*—The authorities bearing on various phases of the master's duty to his employees are presented in the following editorial notes: Statutory liability of employers for defects in

D. C.] Syllabus.

duty cannot be avoided by intrusting its performance to some other employee, there is no guaranty by the employer that the machinery and appliances are absolutely safe (following *Washington Asphalt Block & Tile Co.* v. *Mackey,* 15 App. D. C. 410) ; and where an employee is injured while working with machinery or appliances provided by his employer, the fact of the accident raises no presumption of neglect of duty on the part of the employer.

2. Where an employee undertakes and continues the use of defective and unsafe appliances, either with actual notice of such defect, or where the same is open to ordinary observation in the usual course of its use, he must be deemed to have accepted the risk of all danger reasonably to be apprehended from such use, and cannot recover of his employer. (Following *Hayzel* v. *Columbia R. Co.* 19 App. D. C. 359.)

3. Where a woman employed by a laundryman had her finger crushed while using a mangle furnished for her use, the injury resulting from the improper adjustment of the finger-guard on the mangle, and in an action by her against her employer it appeared that she was twenty-two years of age; had had two years' experience in operating mangles in other laundries before entering the defendant's service, which mangles, however, had been equipped with properly adjusted finger-guards; and had operated the defendant's mangle for two months, during which time the adjustment of the finger-guard was plainly visible,—it was *held* that the trial court properly directed a verdict for the defendant.

No. 1485. Submitted March 10, 1905. Decided April 17, 1905.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action to recover damages for personal injuries. *Affirmed.*

the condition of their plant, note to *Coley* v. *North Carolina R. Co.* 57 L. R. A. 817; Right of servant to recover for injuries caused by projecting screws in shafts and other moving machinery, note to *Ford* v. *Mt. Tom Sulphite Pulp Co.* 48 L. R. A. 96; Liability of electric company to employee for injury caused by electric shock, note to *Western U. Teleg. Co.* v. *McMullen,* 32 L. R. A. 351; Duty of master to instruct and warn servants as to the perils of the employment, note to *James* v. *Rapides Lumber Co.* 44 L. R. A. 33; Duty of master with regard to rules promulgated for the safe conduct of the business, note to *Nolan* v. *New York, N. H. & H. R. Co.* 43 L. R. A. 305; Duty of master to furnish medical aid to servant, note to *Ohio & M. R. Co.* v. *Early,* 28 L. R. A. 546.

The Court in the opinion stated the case as follows:

This action was brought by the appellant, Lillian S. Butler, as plaintiff, in the supreme court of the District of Columbia to recover damages occasioned by the negligence of her employer, the appellee.

The bill of exceptions recites that the plaintiff offered evidence tending to show that the defendant is, and in the year 1902 was, the owner of a steam laundry in the city of Washington, in which laundry was used a machine for drying and ironing clothes, called a mangle. Said mangle consisted essentially of a steel cylinder 4 feet in diameter and 8 feet long, which was heated by steam under a pressure of 80 pounds to the square inch, and was made to revolve in such a way that the surface next to the operator moved upward and away from her. Resting upon the upper half of the surface of the said cylinder were five rollers, which were held in place by attachments to the stationary frame of the machine, and which revolved in a direction opposite to that of the cylinder, the said rollers being set each at a distance of about 6 inches from the next. The purpose of the mangle was to iron and dry the clothes by carrying them over the surface of the cylinder and under the rollers, and it was the duty of the operators feeding the machine to introduce the edge of the article to be ironed between the cylinder and the first roller. For this purpose two operators were necessary, one standing at each side of the mangle and directly in front of the steam cylinder. A part of the machine intended to facilitate the feeding thereof, was a board, called the feed board, which was attached to the frame of the mangle and extended across the machine, just in front of which the operator stood. This feed board was 8 feet long, extended from side to side of the mangle, was 12 to 15 inches wide, 2½ inches thick, and weighed about 60 pounds. The inner edge of the feed board was beveled, so as to fit closely to the surface of the cylinder, and the feed board was so fixed in place by bolts that the inner edge was as close to the cylinder as it could be without causing friction.

It was the duty of the operators feeding the mangle to spread the article to be ironed while damp but having been smoothed out by the hands upon the surface of the feed board, and to gradually push the same across the said board in such a manner that the inner edge of the article should touch the surface of the cylinder, and, being carried upward thereby, should be engaged by the first of the rollers, and so be drawn in between the cylinder and the rollers. To this end it was necessary for the operators to place the palms of their hands flat upon the article to be ironed, so as to produce sufficient pressure for the purpose.

The first roller was about 4 inches above the feed board. For the safety of the operators the machine was equipped with a safety apparatus called a finger-guard. This was a bar of steel, 8 feet long, 3 inches wide, and $\frac{1}{8}$ of an inch thick, fixed to the frame of the machine and extending horizontally from side to side thereof, in front of the cylinder and about 4 inches distant from its revolving surface. Said guard was adjustable within certain limits and might be set at a height above the feed board for $\frac{1}{4}$ of an inch to 4 inches. In the mangle used by the defendant, the guard had been originally adjusted at a height of $1\frac{1}{2}$ inches above the feed board, and had always been in that position, and was so at the time of the accident hereinafter mentioned.

The plaintiff entered the employ of the defendant in the month of May, 1902, and in October of that year was assigned to the duty of assisting in feeding the mangle hereinbefore described. She was about twenty-two years of age, and had had about two years' experience in the operation of mangles in other laundries; that all the mangles she had operated were equipped with safety devices or finger-guards which prevented the operators' hands from coming into contact with the steam cylinder; that during her entire experience in the defendant's and other laundries she had never known or heard of anyone being injured while feeding a mangle by reason of their hands coming into contact with the steam cylinder of a mangle equipped with the safety device or finger-guard rail; that prior to beginning to operate defendant's mangle, plaintiff saw that same was

equipped with a finger-guard rail; that she had never been warned by anyone that said mangle was more dangerous than any of the other machines she had previously operated, nor that the guard rail was improperly adjusted, in that it was too high and would permit of her hands being drawn under same and coming into contact with the cylinder, nor was there anything about the machine to lead her to believe that it was any more dangerous than any other mangle she had operated; that prior to the accident plaintiff did not know, nor had she been warned,. nor had she any reason to suppose, that the finger-guard rail had been adjusted so high that it would permit of her hands. being drawn under it into the machine; she did not know just. how far the finger-guard rail was placed from the cylinder. From the position in which she stood in feeding the machine she could not see the point where the first roller came in contact with the steam cylinder, her view being obstructed by the finger-guard rail; that her hands had never been brought into contact. with the steam cylinder before, nor had her hands ever been carried under the guard rail previous to the injury.

The plaintiff gave evidence tending to show that her duty consisted in feeding the linen to the machine while standing on the left-hand side of same; that the feed board next to the cylinder on the left-hand side was loose and worn; that such was its condition when plaintiff first began to operate it in October, 1902, and so remained up to the time of the injury; that this defect permitted the linen while being fed into the machine to catch on the right-hand side, while at times falling, or dropping between the edge of the feed board and the steam cylinder on the plaintiff's side.

The plaintiff from the time aforesaid in October, when she was assigned to feeding the said mangle, until the 28th day of the following December, was continually and daily employed upon the said machine. During this period she did not report any defect in the construction, adjustment, or repair of the machine, nor did she make any complaint of its condition or request any alterations to be made.

On the 28th day of December, 1902, in the morning, the

plaintiff was engaged in feeding the said mangle, standing on the left-hand side, as she had been accustomed, and another young woman was feeding at the right-hand side thereof. While so engaged, the left hand of the plaintiff was in some manner carried between the cylinder and the first roller, and so injured that amputation thereof became necessary. The manner of the said accident was thus stated in the testimony of the plaintiff herself:

*A.* Why, the morning of the accident nearly every piece we put in the mangle, Miss Cumberland's end would go in before mine and I would have to push, and my hand caught on. \* \* \* *A.* The morning of the accident nearly every piece would catch on Sydney's side before it would catch on mine; and the table cloth would take my hand right on up with it. It dropped down between the board and the cylinder, and when it caught, it carried my hand right on up with it. \* \* \* *A.* Well, the linen would drop down between the board and the cylinder and you had to push it up. *Q.* Do you mean us to understand that you put your hand deliberately inside this finger-guard and down into the space between the feed board and the cylinder? *A.* No, sir. *Q.* How did the linen drop? *A.* The linen instead of going in would drop down between the board and the cylinder and you would push it up, and the young lady working on the other side, hers would catch before mine. *Q.* You had to get hold of the end in some way to push it up? *A.* No, sir; you had to push it up the feed board. *Q.* If the edge of the linen you were feeding had dropped down between the feed board and the cylinder, how could you push it up? *A.* You could push it up and it would come down wrinkled. *Q.* If it had dropped down between the feed board and the cylinder how could you push it up? *A.* It dropped down between the feed board and the cylinder, and when you pushed it up and it came out of the mangle it would come out wrinkled. *Q.* You did not hold the table cloth as it fed into the machine? *A.* Yes, I had hold of the table cloth. *Q.* You pushed the table cloth over the feed board; but you could not catch hold of it, as

a matter of fact? *A.* I had hold of the table cloth and was pushing it up and it dropped. And this day it was worse; every piece we put in it dropped down and we had to push it up; and as I pushed it up in some way or other it took my hand with it. *Q.* You say it was getting worse? *A.* Yes. We had to sprinkle the clothes every day, and this day we had to sprinkle the clothes more than ever. *Q.* And that is the only day you put your hand inside the finger-guard? *A.* Yes. *Q.* Why did you put your hand inside then? *A.* I didn't put my hand inside. The table cloth pulled it in. My hand was on the table cloth pushing it up, and the table cloth caught and it caught my hand with it. *Q.* On this particular occasion even, you didn't push your hand inside the finger-guard? *A.* No, sir; I didn't put my hand under the finger-guard until the table cloth pulled it under. *Q.* So the table cloth had hold of your hand before your hand had gotten past the finger-guard? *A.* The table cloth dropped and I gave it another push to make it catch, and after it dropped it caught it on the cylinder and carried my hand right with it. *Q.* So that your hand had gone past the finger-guard before the table cloth caught it and carried it into the mangle? *A.* The table cloth took my hand right along with it. *Q.* What I want to find out is the exact time that this table cloth became wrapped around your hand in such a way as to take it into that mangle? *A.* The table cloth dropped. Sydney's end had gone in and my end had dropped, and I pushed it and it caught. As soon as the table cloth—it caught and after it caught in some way it took my hand right up with it. *Q.* Where did it drop? Between the feed board and the cylinder? *A.* Between the feed board and the cylinder. *Q.* And it was not until after it dropped that your hand was caught? *A.* It dropped between the feed board and the cylinder, and I had my hand on the feed board to make it catch, and my hand caught and went right up with it.

No other evidence was given upon either side as to the cause and manner of the accident, and it did not appear that any other person had observed the position of the plaintiff's hands.

or the condition of the cloth before or at the time when her hand went under the finger-guard.

The plaintiff offered further evidence tending to show that, upon the occurrence of the accident, the machinery was stopped, the roller lifted, and her hand taken out. It was found that the edge of the table cloth, which was the article in process of mangling when the accident occurred, had been folded back over the fingers and was clasped in the palm of the hand.

The plaintiff offered further evidence of experts in the conduct of laundries and in the operation of laundry machinery to the effect that the sole purpose of the finger-guard was to prevent the fingers of the operator from coming in contact with the cylinder, and that the same could be so adjusted as to prevent such accident; that there was no kind of laundry work which required an adjustment of the guard at more than ½ an inch above the feed board; and that an elevation of ¾ of an inch would lessen its value as a guard.

The defendant offered evidence tending to show that the mangle was of a standard and approved pattern, being considered the best of some half dozen leading "makes." That the machinery of the laundry was under the management and control of an experienced and competent superintendent and a foreman. That a daily inspection was made by the superintendent to see if the machinery was in thorough repair. That the feed board had been securely bolted some weeks before. That the operators were accustomed to pushing the linen with their fingers, instead of with the palms of their hands, which offered better control of the wet linen and prevented the hands from going under the finger-guard. That the finger-guard had been adjusted at a height of 1½ inches when the mangle was installed, and had so remained. That this adjustment was best adapted to the work of the laundry, a lower adjustment causing the wrinkled edges of the half dried heavy work to catch the finger-guard and turn over. That the finger-guard was securely bolted and painted red so as to serve as a warning not to put the hands underneath, and was in full view of the operators. That no complaint had ever been made by plaintiff

and no dissatisfaction expressed. That the finger-guard was 3 or 4 inches from the cylinder and 6 or 7 inches from the point where the first roller meets the cylinder. That the finger-guard was capable of an adjustment of from 1 to 4 inches to suit the various styles and character of the work. That aside from the finger-guard the heat of the steam cylinder would indicate danger, and from point of first contact therewith it was 3 or 4 inches to the point where there was friction sufficient to overcome the slightest effort at withdrawal. That from where the operators stood they could see plainly over the rail of the finger-guard how far it was to the revolving cylinder which was in plain sight and less than 2 feet distant from where the operators stood.

The only substantial conflict between this evidence and that of the plaintiff is in respect of the capacity of the adjustment of the finger-guard. Plaintiff's evidence tended to show that the space of the opening could be reduced to ¼ of an inch.

*Mr. John C. Gittings* and *Mr. Justin Morrill Chamberlin,* for the appellant:

1. The appellee, under the implied contract between employer and employee, was negligent in failing to so adjust the finger-guard rail that it would prevent appellant's hands from coming into contact with the dangerous machinery. *Hough's Case,* 100 U. S. 213; *McDaniels' Case,* 107 U. S. 454; *Herberts' Case,* 116 U. S. 642; *Archibalds' Case,* 170 U. S. 665; *McDade Case,* 191 U. S. 64.

2. Although the appellant may have known of the defects, this will not defeat her recovery, unless she knew that the defect rendered the thing absolutely dangerous. *Hayzel* v. *Columbia R. Co.* 19 App. D. C. 372; *Russel* v. *Minneapolis & St. L. R. Co.* 32 Minn. 234; *Choctaw R. Co.* v. *McDade,* 191 U. S. 64; *Indermaur* v. *Dame,* L. R. 1 C. P. 288; *Baltimore & O. R. Co.* v. *Baugh,* 149 U. S. 386; *Pikesville R. Co.* v. *Russell,* 88 Md. 571; *Wabash R. Co.* v. *McDaniels,* 107 U. S. 457.

3. The failure on the part of the defendant to perform the

duty with which he was charged by the law, would make him liable if the accident could have been prevented by the performance of such duty. Had the finger-guard been adjusted at a safe and proper height, the hand could have in no way been drawn under it and into the machine. It is sufficient for the plaintiff to show that with adequate and safe appliances the injury *might* not have happened. The defendant must prove conclusively that it *must* have happened in spite of his negligence. *David* v. *Garrett,* 6 Bing. 724; *Railroad Co.* v. *Reaney,* 42 Md. 137; *Stergis* v. *Kuntz,* 165 Pa. 358; *Hayes Case,* 111 U. S. 228.

*Mr. Charles A. Keigwin* and *Mr. Leonard J. Mather* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The rule of law is well settled that it is the duty of the employer to provide suitable and reasonably safe machinery and appliances for the use of his employee, and that this duty cannot be avoided by intrusting its performance to some other employee. *Patton* v. *Texas & P. R. Co.* 179 U. S. 658, 664, 45 L. ed. 361, 365, 21 Sup. Ct. Rep. 275; and cases cited.

Notwithstanding this duty rests upon the employer, there is no guaranty by him that the machinery and appliances provided are absolutely safe. *Patton* v. *Texas & P. R. Co.* 179 U. S. 658, 45 L. ed. 361, 21 Sup. Ct. Rep. 275; *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554, 570, 34 L. ed. 235, 241, 10 Sup. Ct. Rep. 1044; *Southern P. Co.* v. *Seley,* 152 U. S. 145, 153, 38 L. ed. 391, 395, 14 Sup. Ct. Rep. 530; *Washington Asphalt Block & Tile Co.* v. *Mackey,* 15 App. D. C. 410, 423.

Therefore, when an injury is received by an employee, while working with the machinery or appliances provided for his operation or use, the fact of accident carries with it no presumption of neglect of duty on the part of the employer, as in the case of a passenger; for example, where there is a contract

for safe carriage, and the burden rests upon the employee to show such negligence as an affirmative fact. "It is not sufficient for the employee to show that the employer may have been guilty of negligence—the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." *Patton* v. *Texas & P. R. Co.* 179 U. S. 658, 663, 45 L. ed. 361, 364, 21 Sup. Ct. Rep. 275.

The testimony of the plaintiff herself, and there was no other as to the immediate cause of the accident, lacks directness and certainty; and one can hardly escape the conclusion that she was not paying sufficient attention at the time to be able to say whether, as a matter of fact, it was due to the unsafe adjustment of the finger-guard, or to her own careless handling of the cloth which she was engaged in pushing into contact with the revolving cylinder.

But assuming the soundness of the contention on her behalf, that her hand could not have been carried between the cylinders at all, if the finger-guard had been so adjusted as to leave a space not exceeding ½ of an inch, of which adjustment it was capable, instead of the actual space of 1½ inches; and assuming also the truth of the testimony offered on her behalf tending to show that a space not exceeding ½ of an inch was ample for the proper operation of the mangle under all conditions, we are of the opinion that the court was right in directing a verdict for the defendant.

It plainly appears from the testimony of the plaintiff that

she was twenty-two years of age at the time of the accident, and it must be presumed that she was possessed of ordinary intelligence. She had had about two years' experience in operating mangles in other laundries before entering the service of the defendant. These, however, had all been equipped with finger-guards adjusted so low as to prevent the operators' fingers from coming in contact with the cylinders which engaged each other a few inches beyond. She entered defendant's service in May, 1902, had been assigned to duty as one of the operators of this mangle in October, and sustained the injury December 28 of the same year.

The space left in the adjustment of the finger-guard, assuming it to have been unusual and unnecessary, as well as dangerous, was unhidden and plainly visible. It was immediately under the plaintiff's eyes and in close proximity to her finger ends when she was constantly employed in pushing the cloth which passed under it into engagement with the ironing cylinders. It is inconceivable that this adjustment could have escaped the observation of the plaintiff during more than two months of this constant employment. Under such circumstances she must be presumed to have had knowledge of a condition which would necessarily have become known through the ordinary exercise of her faculties. The defect being obvious to one of plaintiff's intelligence and experience, the defendant was under no duty to instruct her in the performance of her services, or to correct it in the absence of any complaint or request made by her.

The doctrine of law is established beyond question, that where an employee undertakes and continues the use of defective and unsafe appliances, either with actual notice of such defect, or where the same is open to ordinary observation in the usual course of its use, he must be deemed to have accepted the risk of all danger reasonably to be apprehended from such use, and cannot recover of his employer. *Southern P. Co.* v. *Seley,* 152 U. S. 145, 155, 38 L. ed. 391, 396, 14 Sup. Ct. Rep. 530; *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554, 570, 34 L. ed. 235, 241, 10 Sup. Ct. Rep. 1044; *Texas & P. R. Co.* v.

*Archibald,* 170 U. S. 665, 673, 42 L. ed. 1188, 1192, 18 Sup. Ct. Rep. 777; *Hayzel* v. *Columbia R. Co.* 19 App. D. C. 359, 371; *Crowley* v. *Pacific Mills,* 148 Mass. 228, 19 N. E. 344.

In the following cases, all of which were actions for injuries sustained by employees in the operation of mangles, recoveries were denied under the application of this doctrine to facts and circumstances of the same general nature as those shown in the case at bar. *Connolly* v. *Eldredge,* 160 Mass. 566, 570, 36 N. E. 469; *Blom* v. *Yellowstone Park Asso.* 86. Minn. 237, 239, 90 N. W. 397; *Kenean* v. *Waters,* 181· Pa. 247, 37 Atl. 344.

For the reasons stated the judgment must be affirmed, with costs; and it is so ordered.          *Affirmed.*

A writ of error to the Supreme Court of the United States was allowed June 15, 1905.