## CARR v. SHIFFLETTE et al.
### No. 6466.

United States Court of Appeals for the District of Columbia.

Decided March 2, 1936.

H. Mason Welch, John R. Daily, and Gerald I. Oxenburg, all of Washington, D. C., for appellant.

James E. Shifflette and John D. Fitzgerald, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

ROBB, Associate Justice.

Appeal from a judgment for the plaintiff in the Supreme Court of the District in an action for malpractice.

Subsequent to the docketing of this appeal the then appellee (plaintiff below), Lucille Nichols, married James J. Baldwin, and thereafter, on May 12, 1935, Mrs. Baldwin committed suicide. On September 9, 1935, we granted the petition of the administrators of her estate to be substituted as appellees.

The declaration alleges (counts 2 and 3) that shortly prior to the 15th day of October, 1932, the defendant physician, Dr. Carr, prescribed and treated plaintiff for a physical trouble or ailment, and that in such treatment it was the duty of the defendant to exercise reasonable and proper care so as to avoid injuring and humiliating the plaintiff; yet, notwithstanding that duty, the defendant did not exercise such care, in this, that the defendant, "being then and there ignorant of the use of, and unskilled in the operation and effect of a certain machine" and "disregarding her duty to the plaintiff * * * sought, requested and allowed one Walton P. Smith, a person untrained in the science of medicine or surgery and unfamiliar with the trouble, condition and body of the plaintiff," to view plaintiff's body and to perform an operation thereon; and "did negligently, carelessly, and recklessly cut, burn and otherwise injure the plaintiff." Plaintiff further alleged that the defendant "negligently, carelessly and recklessly permitted and allowed the said Walton P. Smith to attempt and to perform an operation upon and to see and view the body and private person of the plaintiff"; that "by reason of the negligence, carelessness and recklessness of the defendant as aforesaid, the plaintiff has been rendered sick, sore, shocked, distressed and humiliated,

* * * whereby and wherefore, said plaintiff has been put to great expense in an attempt to effect a cure of her trouble and ailment caused by defendant's negligence, carelessness and recklessness, as aforesaid."

The defendant filed several pleas, not necessary to be stated.

Plaintiff, 35 years old, testified that she consulted Dr. Carr professionally in September, 1932, and was given a thorough physical examination. Plaintiff had been having "a colored discharge." Defendant informed her that this discharge was probably coming from a small growth in the uterus; "that the discharge had backed up into the tubes and that a major operation was recommended." That if plaintiff would not have an operation, "a cauterization might clear up the trouble." Plaintiff had had a cauterization before by Dr. Perkins. Since childhood "she had had what is termed 'leucorrhea.'" Defendant informed her that she (defendant) was getting a new cauterizing machine "and that she would have someone in the office the following Saturday to give her (plaintiff) a treatment. She told the defendant she did not want a stranger giving her treatments who was not a doctor. She (plaintiff) was advised that the one giving the treatment would be there from the largest surgical supply house in New York." On October 15th, following, at Dr. Carr's office, plaintiff was introduced to "Dr. Smith." He had the machine there and explained the mechanism of it to plaintiff, and took out a piece of meat and showed her how to make a cauterization. "Dr. Carr asked her if she would rather have Dr. Smith give her the treatment and she naturally said yes, because she (Dr. Carr) could not use the machine. She saw she (Dr. Carr) could not use it. The meat gummed up and he (Smith) told her (Dr. Carr) that she would have to practice before she got onto it. She (plaintiff) saw his skill and was satisfied that she wanted him to do it. * * * She decided on him rather than Dr. Carr, first, because she thought that he was a doctor and second, because she could see that he was more skillful with the instrument than Dr. Carr." Thereupon Smith, in the presence of Dr. Carr, used the cauterizing machine on plaintiff. After the treatment plaintiff announced that she had promised to go to a dance that night, and was advised by Smith "to go right ahead and dance," which she did. The next day apparently everything was all right, and on the following day her regular flow started. Thereafter, "when it (her regular flow) naturally would have stopped there was a profuse flowing of blood with clots and throbbing." She consulted defendant, who advised her that there was a physician (Dr. Custis) in town who had one of the machines and that she (defendant) would call him. Defendant talked with Dr. Custis over the telephone and was advised "that the plaintiff should be packed for twenty-four hours." Dr. Carr expressed the opinion that packing would not do any good.

The same day defendant gave plaintiff two hypodermics. Plaintiff "advised the defendant that she had an engagement with a young man that night and the defendant told her that she would try to come and see her between seven and eight." Plaintiff waited for defendant until 10:30 or 11, "and then went out for a ride with the young man and they returned around 12 o'clock." Defendant was then waiting for her and gave her another hypodermic. Plaintiff "went to the defendant's office late the next afternoon and told her that something had to be done and defendant took her to Dr. Custis. That was on October 29." Dr. Custis treated her until December 15th, "and at that time the bleeding had ceased." During the time she was being treated by Dr. Custis "she was nervous and had headaches from two to three months, and she could not eat. * * * She finally went back to Dr. Perkins, the doctor who had cauterized her originally. She went to Dr. Perkins in March, 1933," and he advised her to take a complete rest to quiet her nerves and go to a nursing home. Dr. Carr had "advised her and urged her before treatment to take a complete rest and go to a sanitarium or nurses' home and she refused. Dr. Perkins advised and recommended the same thing and she did go to a nurses' home." The instrument that Dr. Custis used to coagulate "looked exactly like the instrument that was used in Dr. Carr's office. * * * When Dr. Custis discharged her in December, 1932, her body was entirely healed of the bleeding. * * * That she had some bleeding from the time she had the cauterization at Dr. Carr's office until Dr. Custis cleared it up. * * *"

Dr. Perkins, a physician of 33 years' experience, testifying for plaintiff, recalled having treated her professionally December 2, 1931. "When patient came in she gave a history of lack of appetite, morn-

ing nausea, constant headache in back of neck and nervousness. His findings and diagnosis were leucorrhea, erosion at end of uterus, 'cervical waste,' which means erosion of the uterus; prolapsed right kidney, and three small hemorrhoids. He cauterized her for the leucorrhea condition and by 'cauterizing' he meant burning off the area at the end of the uterus which was irritated and of course infected. That after the cauterization the patient did bleed but he could not state whether the bleeding was profuse or not. * * * On March 1, 1933, she again visited his office and found, as he had said before, a right kidney was prolapsed and on the vaginal wall a cyst about the size of an almond. The uterus was in the same position, normal as before. There was no discharge from the cervix and no erosion. In other words, there was not anything there, as he had found before when he cauterized it. *. * * Bleeding follows all cases of cauterization that he had ever done. * * * In 1931 Mrs. Nichols said she was nervous. When he saw her again in 1933 she again said she was nervous. * * * That her complaint with reference to nervousness was the same in 1933 and 1934 as in 1931 and she gave the same history in 1931 that she did in 1933. That when he examined Mrs. Nichols in 1933 he found nothing in her vagina or otherwise, that indicated that that organ or area had been in any way damaged or injured by reason of a cauterization done in 1932 by Dr. Carr. * * * That he treated her from December 2, 1931, until January 18, 1932, before he discharged her as cured. That if he did not discharge her until January 18 the likelihood is that she was bleeding practically up until that time."

Dr. Custis, the only other witness, testified that Dr. Carr brought Mrs. Nichols to his office for an examination and treatment "because of some bleeding from the cervix. At the time he found she had a small amount of bleeding from the uterine cervix which followed an operation on the cervix with a high frequency current. * * * The instrument is placed in the cervix of the uterus, that is, the opening of the uterus, with a high frequency current, and then it is turned around and as it goes around a little wire on the side of it cuts a shaving from the mucous membrane of the cervical canal. It cuts with a high frequency current. That is a coagulation of the tissue as it goes by; it might be called a burn, of course, but it only dam-

ages the tissue. * * * That it is preferable and much better medical practice to try to stop the bleeding without coagulation. That if there was some bleeding following the cauterization of October 15, and that the doctor in charge of the patient (Dr. Carr) tried by medicants and certain compounds to stop the bleeding without resorting to coagulation, she was following the best and most approved practice. Mrs. Nichols' bleeding lasted a little longer than usual for those cases. Nothing much unusual followed the cauterization. * * * His judgment at the time was that there were many cases that did not bleed as much and many cases that bled just as much or more. That he found nothing in the walls of Mrs. Nichols' organs where she had been cauterized that was unusual or different from that following the ordinary cauterization. That the walls had not been injured, burned, scraped or otherwise different from what ordinarily happens in cauterization. That the cauterization was not as deep as some of them."

Thereupon counsel for plaintiff announced his case closed. Counsel for defendant moved the court to direct a verdict for the defendant. This the court declined to do, but submitted the case to the jury, with the result that a verdict was rendered for the plaintiff, and the case was brought here.

It is established law that it is the duty of a physician when practicing his profession to exercise the ordinary care and skill of that profession in a similar locality, giving due consideration to modern advancement and learning. There is an implied agreement that no injurious consequences will result from want of proper skill, care, or diligence; but one who seeks to recover against a physician, alleging lack of skill or negligence, has the burden of proving the averments. Cayton v. English, 57 App.D.C. 224, 23 F.(2d) 745; Hazen v. Mullen, 59 App.D.C. 3, 32 F.(2d) 394; Wilson v. Borden, 61 App.D.C. 327; 62 F. (2d) 866. Judge Taft (later Chief Justice of the United States) in Ewing v. Goode (C.C.) 78 F. 442, 443, said: "Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury." Generally speaking, the failure of an operation alone creates no presumption of lack of

skill or care; nevertheless it is a circumstance entitled to some consideration, when considered with other evidence tending to prove lack of skill or care. Crist v. White, 62 App.D.C. 269, 66 F.(2d) 795; Grubb v. Groover, 62 App.D.C. 305, 67 F.(2d) 511. It is also settled law that a motion for a directed verdict accepts as true every material fact in evidence, with the reasonable inferences deducible therefrom. Grubb v. Groover, 62 App.D.C. 305, 67 F. (2d) 511, and cases there cited.

When considered in the light of the foregoing statement of applicable law, we think it clear that the court below erred in refusing defendant's motion for a directed verdict.

The evidence discloses that Mrs. Nichols at the time of defendant's treatment was and had been suffering from a chronic genital condition, for which she previously had been treated. It also discloses that the cauterizing machine with which the defendant's treatment was administered was of approved type. Dr. Perkins, according to his testimony, "treated her from December 2, 1931, until January 18, 1932," and administered substantially the same treatment for substantially the same condition or ailment as the treatment administered plaintiff by defendant. According to Dr. Custis "there were many cases that did not bleed as much and many cases that bled just as much or more." The doctor also stated "that he found nothing in the walls of Mrs. Nichols' organs where she had been cauterized (by defendant) that was unusual from that following the ordinary cauterization."

The averment as to Smith is that he, in the presence of and at the instance and request of the defendant, negligently used the cauterizing machine on the body of plaintiff and in such use "did negligently, carelessly, and recklessly cut, burn and otherwise injure the plaintiff." While the evidence supports the allegation that Smith was acting as the agent of the defendant, there is no evidence that in the use of the machine he was guilty of negligence or lacking in skill.

In his charge to the jury, which we must assume was satisfactory to the plaintiff, the court at the outset said: "As you have been told throughout the trial and argument, this is a suit for damages, for personal injuries alleged to have been received by the plaintiff through the negligence of the defendant." That it was claimed that defendant disregarded her duty to plaintiff, "and negligently and carelessly permitted, sought and requested a man by the name of Smith to perform an operation on the plaintiff *in an unskillful and negligent and careless manner,* the result of which the plaintiff suffered great physical pain and injury, suffered humiliation therefrom and was occasioned to expend large sums of money as a result thereof for medical attention." (Italics ours.) Later on in the charge, the court said: "The first thing you determine is whether the defendant *in any wise acted negligently* or carelessly in the performance of her duty to the plaintiff. If you find she was not negligent, careless or reckless, that is the end of your consideration. If you find that what she did she did recklessly, carelessly and negligently, then you are to determine whether or not 'the plaintiff was injured by that act of the defendant, *or whether or not the condition of the plaintiff after this operation was no different than it was before or after, or whether worse.*" (Italics ours.)

Appellees cite DeMay v. Roberts, 46 Mich. 160, 9 N.W. 146, 41 Am.Rep. 154, which was an action in deceit against a physician who took an unprofessional person with him to attend a confinement case when there was no emergency requiring the nonmedical person's presence. That case, being based on deceit, and not upon tortious injury, is, therefore, not in point. The present case having been tried and submitted to the jury on the theory of injury to plaintiff resulting from defendant's negligence, "the plaintiff cannot be permitted on this review to change to another which the defendant was not required to meet below." Virginian Ry. v. Mullens, 271 U.S. 220, 227, 46 S.Ct. 526, 529, 70 L. Ed. 915.

If in a case like this a physician or surgeon is to be chargeable with negligence, "few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' " Ewing v. Goode (C.C.) 78 F. 442. 443.

The judgment is reversed, and the cause remanded.

Reversed and remanded.

STEPHENS, Associate Justice (concurring).

I concur in the result for the reason that, without objection by the plaintiff, the

case was apparently submitted to the jury upon the theory of negligence causing physical injury only and not upon the theory of negligence causing mental anguish. And as pointed out in the opinion of the court, there was no evidence of physical injury, that is to say, the consequences of the operation performed by the layman in the case were no different, according to the testimony, from those where a similar operation is performed by a licensed practitioner of medicine. Negligence is, of course, not actionable without injury.

In my view, however, the defendant was guilty, under the evidence, of an actionable wrong which, if submitted to the jury, would have warranted a verdict awarding damages for mental anguish. As recognized in the opinion of the court, the duty of a physician is to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession in similar communities. This obviously includes a duty to furnish professional, not lay, care. The plaintiff complained and proved that her body was exposed to the view and examination of a layman, and to an operation performed by such layman, all without knowledge on the plaintiff's part that he was a layman rather than a physician. While there was no direct statement by the plaintiff in her testimony concerning mental anguish, I think a jury might reasonably draw inference from the fact that the plaintiff was exposed to view, examination and operation in the manner above described that she did suffer mental anguish, especially in view of the fact that she testified "she told the defendant she did not want a stranger giving her treatments who was not a doctor"—this in advance of the operation. The only doubt about legal recognition as an actionable wrong of the manner of treatment above described arises from the rule that in suits sounding in tort for negligence (or indeed in actions of contract) recovery cannot be had for mental suffering unless it accompanies physical injury. Southern Express Co. v. Byers, 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825. As under the evidence in this case there was no physical injury—although there was an invasion of the plaintiff's person—it may be said to follow that no recovery for plaintiff's mental anguish

may be allowed. But the reason for the rule against allowing recovery for mental anguish unless it accompanies physical injury is, in the large, the danger of false claims, because a case would rest solely on the testimony of the plaintiff that mental suffering was experienced, with substantially no means of disproof of this by the defendant. Kester v. Western Union Tel. Co. (C.C.) 55 F. 603. But in my view this reason for the rule fails in respect of a case such as the present one, where the evidence of mental suffering comes not from testimony descriptive of such suffering as such but by way of inference from the fact of exposure of the plaintiff's person to the view, examination and operation of a layman, of which fact, as above stated, there was ample proof. There is apparently but one case, De May v. Roberts, 46 Mich. 160, 9 N.W. 146, 147, 41 Am.Rep. 154, recognizing as actionable treatment similar to that to which the plaintiff was subjected here. There a woman exposed during childbirth to the presence and view of a lay male friend of the physician's whom the latter had on a stormy night "fetched * * * along to help carry my things," was not informed that this person was not a doctor. Apparently from the language of that court this was held actionable on the theory of tort for deceit causing mental anguish.

It is pertinent to comment further that the fact that no physical injury came to the plaintiff in this case was probably a happy accident rather than the result of any proper exercise of professional care, for while the lay person in question in the case, the district manager of a surgical supply house, might have acquired through practice in a laboratory or otherwise, for the purposes of sales demonstrations, skill in the use of the particular instrument so far as its actually touching and searing tissues is concerned, such person could hardly, for lack of general medical training and experience, be capable of meeting unexpectedly varied conditions or emergency consequences. Moreover, the defendant herself confessedly had no skill in the use of the instrument and inferentially, therefore, no skill in dealing with the consequences of its use.