**Richard E. MORRISON, Appellant,**

v.

**Tom MacNAMARA et al., Appellees.**

**Tom MacNAMARA et al., Appellants,**

v.

**Richard E. MORRISON, Appellee.**

**Nos. 13503, 13504.**

District of Columbia Court of Appeals.

Argued Jan. 25, 1979.

Decided Oct. 2, 1979.

---

Janis L. M. McDonald, Alexandria, Va., with whom John D. Grad, Alexandria, Va., was on the brief for appellant in No. 13503 and appellee in No. 13504.

Patrick J. Attridge, Rockville, Md., for appellees in No. 13503 and appellants in No. 13504.

Before NEWMAN, Chief Judge, MACK, Associate Judge, and YEAGLEY, Associate Judge, Retired.[*]

NEWMAN, Chief Judge:

Appellant Morrison, a plaintiff in a medical malpractice action in the trial court, challenges a judgment in favor of appellees, a nationally certified medical laboratory and a medical technician. He contends that the trial court erred in denying his requested jury instruction that the standard of care to which appellees should be held is a national standard as opposed to a local one. He further contends that the trial court erred in permitting the jury to consider the issue of assumption of the risk. We agree with appellant on both contentions and reverse.[1]

In Part I, we set forth the relevant facts and trial proceedings. In Part II, we discuss the standard of care issue and explain why the verdict in favor of appellees must be set aside. In Part III, we consider the issue of assumption of risk and set forth reasons why the trial court's submission of this issue to the jury also requires reversal.

I

FACTS AND TRIAL PROCEEDINGS

The facts at trial were basically undisputed. They indicated that upon orders of his personal physician, appellant went to appellee Oscar B. Hunter Memorial Laboratories, Inc., a nationally certified clinical medical laboratory located in the District of Columbia, for the performance of a urethral smear test.[2] The test was administered by appellee Tom MacNamara, a clinical technician, who at that time had been employed by appellee Hunter Laboratories for approximately seven months. According to the technician, he administered the test by inserting a cotton swab about a quarter-inch into the penis with appellant in a standing position. Following the completion of the first test, appellant complained of feeling faint. The technician instructed appellant to sit down and rest, and to place his head between his legs. The technician did not attempt to examine appellant or seek medical assistance so that the source and extent of appellant's complaints could be ascertained.

Approximately two to three minutes later, the technician asked appellant "if it was okay to go ahead" with a second test and appellant replied "yes." The technician then proceeded to perform the test a second time, again with appellant in a standing position. While the test was being administered a second time, appellant fainted, striking his head on a metal blood pressure stand and on the tile covered floor. Subsequently, he was taken to George Washington University Hospital where he was admitted as a neurosurgery patient. As a result of this incident, appellant sustained a number of injuries including a permanent loss of his sense of smell and a partial loss of his sense of taste. Appellant brought an action against appellees charging them with professional malpractice in the manner in which they conducted the test and for pro-

___

[*] Judge Yeagley was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on April 20, 1979.

[1] On their cross-appeal in No. 13504, *MacNamara, et al.*, contend that the trial court erred in denying their motions for a directed verdict. We find no merit in this cross-appeal.

[2] The urethral smear test, done in this case for trichomonas, a nonvenereal disease of the urinary tract, is generally performed by obtaining fluid samples from the tip of the penis and subjecting them to various laboratory tests.

ceeding with the test despite the fact that appellant had complained of feeling faint.

At trial the principal issue in dispute concerned the appropriate standard of care to be applied to appellees. Appellant maintained that since the laboratory was nationally certified and held itself out to the public as such, appellees should be held to a national standard of care. In this connection, appellant presented as an expert witness, Dr. George Shargel, a board certified urologist and a member of the American College of Surgeons, who practiced in the state of Michigan. Dr. Shargel stated that although appearing simple, the urethral smear test involved a highly invasive procedure causing severe pain, particularly if there is disease or inflammation present. He testified that the insertion of a swab into the male organ produces a vasal vagal reflex in a patient which causes the blood to rush from the brain to the area being traumatized, thereby causing the patient to feel faint. For this reason, Dr. Shargel explained, the nationally accepted medical standard of care requires the test to be administered with the patient in a prone or sitting position. Moreover, Dr. Shargel testified that with respect to obtaining a good specimen, there was no qualitative difference between administering the test with the patient in a standing or prone position.

Dr. Shargel also testified that to proceed with a second urethral smear test with the patient in a standing position shortly after a patient complained of feeling faint is contrary to nationally accepted standards of care. He stated that it would be improper to rely solely on a patient's word that he feels better minutes after complaining of faintness. The proper procedure according to Dr. Shargel, would be to use more objective criteria such as pulse or blood pressure, to evaluate the patient medically.

Appellees presented several expert witnesses who testified on the applicable professional standard of care—all of whom were from the Washington, D.C. metropolitan area. Dr. Oscar B. Hunter, the principle owner of the appellee laboratory, testified that the laboratory was nationally certified by the College of American Pathologists and that the laboratory holds itself out to the public as such. According to Dr. Hunter, it is not a deviation from accepted medical standards in the Washington, D.C. metropolitan area or anywhere in the country for the urethral smear test to be administered with a male patient in a standing position. He also stated that the decision to proceed with a second test after the plaintiff had complained of feeling faint was simply a matter of judgment.

Dr. Richard E. Palmer, a pathologist with a clinical laboratory in Alexandria, Virginia, also testified as an expert witness for the appellees. Dr. Palmer stated that he was not aware of any national standards for conducting the urethral smear test, but that in the Washington metropolitan area the accepted procedure is that the test is administered with a male patient in a standing position. Moreover, according to Dr. Palmer, it would be a proper exercise of judgment to repeat the test after a patient complained of feeling faint, if the patient subsequently indicated that he felt better. However, Dr. Palmer stated that he would medically evaluate the patient to ascertain whether the patient was capable of undergoing a second test.

Appellees' final expert witness was Dr. William Dolan, a pathologist and director of the pathology laboratory at Arlington Hospital in Virginia. Dr. Dolan stated that he was not aware of any national standards for conducting the urethral smear test, but that for the past thirty years he has always administered the test with the patient in a standing position. Dr. Dolan stated that if confronted with a patient who complained of feeling faint, he would not only inquire how the patient was feeling, but would also medically evaluate the patient to determine if the patient was capable of proceeding with a second test.

At the close of all the evidence, appellant submitted several jury instructions which were based on the national standard of care. Appellant maintained that in view of the national certification of the laboratory, the laboratory was under a duty to adhere

to nationally accepted standards for administering the urethral smear test, and that the jury should be so instructed. Appellees argued that the laboratory owed only the duty to adhere to that standard of medical care recognized in the Washington, D.C. metropolitan area. The trial court agreed with appellees and instructed the jury as follows:

> You are instructed that a medical laboratory and its personnel are required to exercise such care and skill as is exercised by other medical laboratories and their employees in good standing *in the same community*. That the degree of care and skill required is not the highest degree of care and skill known to the profession, but that which is exercised by ordinary and reasonably competent laboratory personnel in the treatment of patients under the same or similar circumstances. . . [Emphasis added.]

In addition, at the request of appellees and over the objection of appellant, the trial court submitted to the jury the issue of assumption of the risk based on appellant's "consent" to the administering of the second urethral smear test. The jury returned a verdict in favor of appellees on all issues.

## II

### THE STANDARD OF CARE IN MEDICAL MALPRACTICE

A. *General Principles*

■ The elements which govern ordinary negligence actions are also applicable in actions for professional negligence. The plaintiff bears the burden of presenting evidence "which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." *Kosberg v. Washington Hospital Center, Inc.*, 129 U.S. App.D.C. 322, 324, 394 F.2d 947, 949 (1968), *quoted in Haven v. Randolph*, 161 U.S.App. D.C. 150, 151, 494 F.2d 1069, 1070 (1974). In negligence actions the standard of care by which the defendant's conduct is meas-

ured is often stated as "that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances." *Washington Hospital Center v. Butler*, 127 U.S.App.D.C. 379, 383, 384 F.2d 331, 335 (1967); *McGettigan v. National Bank of Washington*, 115 U.S.App.D.C. 384, 386, 320 F.2d 703, 705, *cert. denied*, 275 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963); *Richardson v. Gregory*, 108 U.S. App.D.C. 263, 266, 281 F.2d 626, 629 (1960). Accordingly, this standard of care, which evaluates a defendant's conduct against that conduct which is reasonable under the circumstances, is also applicable in the law of professional negligence. The law of negligence generally does not acknowledge differing standards or categories of care, but requires an adherence to a uniform standard of conduct: that of reasonable care under the circumstances. *Blumenthal v. Cairo Hotel Corp.*, D.C.App., 256 A.2d 400, 402 (1969); *D.C. Transit System, Inc. v. Carney*, D.C.App., 254 A.2d 402, 403 (1969).

■ One of the factors which may be relevant to the determination of what is reasonable care under the circumstances is the special knowledge or skills which a defendant possesses. *See generally* W. Prosser, The Law of Torts § 32, at 161–66 (4th ed. 1971). As Comment m to the Restatement of Torts explains:

> If the actor has in fact more than the minimum of these qualities [*i. e.*, attention, perception, memory, knowledge, intelligence, and judgment], he is required to exercise the superior qualities that he has in a manner reasonable under the circumstances. The standard becomes, in other words, that of a reasonable man with such attributes. [Restatement (Second) of Torts § 289, Comment m.]

■ In sum, the duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. It is this notion of specialized knowledge and skill which animates the law of professional negligence. Thus, an insurance agent is under a duty to exercise such reasonable care and skill as is expected of an

insurance agent acting under similar circumstances. *Adkins & Ainley, Inc. v. Busada*, D.C.App., 270 A.2d 135, 137 (1970). An optometrist must exercise the degree of skill expected of an optometrist acting under the same circumstances. *See Evers v. Buxbaum*, 102 U.S.App.D.C. 334, 253 F.2d 356 (1958). Similarly, a lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances. *Cf. Niosi v. Aiello*, D.C. Mun.App., 69 A.2d 57 (1949) (attorney not liable for negligence if client never had a cause of action).

■ In medical malpractice, a term referring to ordinary negligence concepts in the area of medical diagnosis, treatment, and the like, the duty of care is generally formulated as that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances. *See Washington Hospital Center v. Butler, supra* 127 U.S.App.D.C. at 383, 384 F.2d at 335. *See generally* Prosser, *supra* § 32, at 161–66; McCoid, *The Care Required of Medical Practitioners*, 12 Vand.L.Rev. 549, 558 (1959). Thus, whether health care professionals be physicians, *Rodgers v. Lawson*, 83 U.S.App.D.C. 281, 170 F.2d 157 (1948), radiologists, *see Christie v. Callahan*, 75 U.S.App.D.C. 133, 124 F.2d 825 (1941); *Hazen v. Mallen*, 59 App. D.C. 3, 32 F.2d 394 (1929); *Sweeney v. Erving*, 35 App.D.C. 57, 61, *aff'd*, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913), or hospitals, *see Washington Hospital Center v. Butler, supra*; *Garfield Memorial Hospital v. Marshall*, 92 U.S.App.D.C. 234, 204 F.2d 721 (1953), their conduct must comport with that degree of care reasonably expected of other medical professionals with similar skills acting under the same or similar circumstances, *i. e.*, they must adhere to the standard of reasonable care.

*B. Geographic Limitations on the Standard of Care*

■ The locality rule states that the conduct of members of the medical profession is to be measured solely by the standard of conduct expected of other members of the medical profession in the same locality or the same community. *See generally* Prosser, *supra* § 32, at 164; McCoid, *supra* at 569. This doctrine is indigenous to American jurisprudence and appears to have developed in the late nineteenth century. *See Robbins v. Footer*, 179 U.S.App.D.C. 389, 393, 553 F.2d 123, 127 (1977); *Shilkret v. Annapolis Emergency Hospital Association*, 276 Md. 187, 192–93, 349 A.2d 245, 248 (1975). *See generally* Waltz, *The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation*, 18 DePaul L.Rev. 408, 415 (1969).[3] The rule was designed to protect doctors in rural areas who, because of inadequate training and experience, and the lack of effective means of transportation and communication, could not be expected to exhibit the skill and care of urban doctors. *See Force v. Gregory*, 63 Conn. 67, 27 A. 1116 (1893); *Smothers v. Hanks*, 34 Iowa 286 (1872); *Tefft v. Wilcox*, 6 Kan. 46 (1870); *Small v. Howard*, 128 Mass. 131 (1880). *See generally* McCoid, *supra* at 569.[4] One of the earliest expressions of this rationale appeared in *Tefft v. Wilcox, supra* at 63–64:

In the smaller towns and country, those who practice medicine and surgery, though often possessing a thorough theoretical knowledge of the highest elements of the profession, do not enjoy so great opportunities of daily observation and practical operations, where the elementary studies are brought into every day use, as those have who reside in the metropolitan towns; and, though just as well informed in the elements and literature of their profession, they should not be expected to exercise that high degree of

---

3. The locality rule has never appeared in England in cases involving medical malpractice. *See generally* Note, 60 Ky.L.J. 209, 210 (1976).

4. The early medical school curriculum was less standardized than that which presently exists. "[It] consisted of a course of lectures over a period of 6 months. . . . This formal education was supplemented by apprenticeships with doctors who had even less formal education." Note, 23 Vand.L.Rev. 729, 732 n. 16 (1970) (citations omitted).

skill and practical knowledge possessed by those having greater facilities for performing and witnessing operations, and who are, or may be, constantly observing the various accidents and forms of disease.

In addition, it was argued that in view of the ability of urban areas to attract the most talented doctors, a rule which would hold rural doctors to urban standards of care would precipitate the departure of doctors from rural areas and thereby leave rural communities without sufficient medical care. *See Burke v. Foster*, 114 Ky. 20, 25, 69 S.W. 1096 (1902). *See also* Note, 78 U.Pa.L.Rev. 91, 96–97 (1929). In sum, the locality rule was premised on the notion that the disparity in education and access to advances in medical science between rural and urban doctors required that they be held to different standards of care.

The cases in this jurisdiction exhibit a lack of uniformity on the issue of the geographic area in which the conduct of members of the medical profession is to be measured. For example, a number of cases state that members of the medical profession are held to the skill and learning exercised by members of their profession in the District of Columbia. *See, e. g., Garfield Memorial Hospital v. Marshall, supra* 92 U.S.App.D.C. at 239, 204 F.2d at 725 ("in the community"); *Hohenthal v. Smith*, 72 App.D.C. 343, 346, 114 F.2d 494, 497 (1940) ("in the District"); *Wilson v. Borden*, 61 App.D.C. 327, 330, 62 F.2d 866, 869 (1932), *cert. denied*, 288 U.S. 615, 53 S.Ct. 506, 77 L.Ed. 988 (1933) ("in the District of Columbia"); *Gunning v. Cooley*, 58 App.D.C. 304, 307, 30 F.2d 467, 470 (1929) ("in this locality"); *Carson v. Jackson*, 52 App.D.C. 51, 55, 281 F. 411 (1922) ("in the District"); *Sweeney v. Erving*, 35 App.D.C. 57, 61, *aff'd*, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913) ("in that locality"). In other cases, the standard is referred to as that degree of care exercised by other members of the medical profession in the District or a similar locality. *See, e. g., Brown v. Keaveny*, 117 U.S.App. D.C. 117, 118, 326 F.2d 660, 661 (1963) (per

curiam) ("in his own or similar localities"); *Quick v. Thurston*, 110 U.S.App.D.C. 169, 171, 290 F.2d 360, 362 (1961) (en banc) ("in his own or similar localities"); *Rodgers v. Lawson, supra*, 83 U.S.App.D.C. at 282, 170 F.2d at 158 ("in his own or similar localities"); *Carr v. Shifflette*, 65 App.D.C. 268, 270, 82 F.2d 874, 877 (1936) ("in a similar locality"). Finally, a number of cases have articulated the medical standard of care without referring to any geographic limitation whatsoever. *See, e. g., Harris v. Cafritz Memorial Hospital*, D.C.App., 364 A.2d 135, 137 n. 2 (1976); *Christie v. Callahan, supra* 75 U.S.App.D.C. at 135–36, 124 F.2d at 827–28; *Cayton v. English*, 57 App.D.C. 324, 327, 23 F.2d 745, 748 (1927); *Levy v. Vaughn*, 42 App.D.C. 146, 153 (1914). Since courts in this jurisdiction were never directly presented with this issue, the empirical validity of the assumptions behind the locality rule has not previously been examined.[5]

■ Even a cursory analysis of the policy behind the locality doctrine reveals that whatever relevance it has to the practice of medicine in remote rural communities, it has no relevance to medical practice in the District of Columbia. Clearly the nation's capital is not a community isolated from recent advances in the quality of care and treatment of patients. Rather, it is one of the leading medical centers in quality health care. The medical schools in the nation's capital rate as some of the most outstanding schools in the nation. The hospitals in the District not only possess some of the most recent medical technology, but also attract some of the best medical talent from all over the country. Moreover, medical journals from all over the country are available to health care professionals in the District of Columbia, serving to keep practitioners abreast of developments in other communities. In short, the locality rule was designed to protect medical practitioners in rural communities, not practitioners in leading metropolitan centers such as the District of Columbia.

**5.** *But see Robbins v. Footer, supra.*

Moreover, any purported disparity between the skills of practitioners in various urban centers has for the most part been eliminated. Unlike the diversified and often limited training that was available a hundred years ago, medical education has been standardized throughout the nation through a system of national accreditation. *See generally* Note, 14 Stan.L.Rev. 884, 887–88 (1962); Note, 23 Vand.L.Rev. 727, 732–33 (1970).[6] Moreover, the significant improvements in transportation and communication over the past hundred years cast further doubt on continued vitality of the doctrine. Louisell & Williams commented on this development:

> The comprehensive coverage of the Journal of the American Medical Association, the availability of numerous other journals, the ubiquitous "detail men" of the drug companies, closed circuit television presentations of medical subjects, special radio networks for physicians, tape recorded digests of medical literature, and hundreds of widely available postgraduate courses all serve to keep physicians informed and increasingly to establish nationwide standards. Medicine realizes this, so it is likely that the law will do likewise. [D. Louisell & H. Williams, The Parcenchyma of Law, 182, 183 (1960).]

In sum, the major underpinnings of the locality doctrine no longer obtain. The locality rule has been quite properly criticized as a relic of the nineteenth century which has no relevance to the realities of modern medical practice. *See, e. g.,* Waltz, *supra* at 419–20; Comment, *Standard of Care for Medical Practitioners—Abandonment of the Locality Rule,* 60 Ky.L.J. 209 (1971); Note, *Medical Malpractice: "Locality" Rule Abandoned in Massachusetts,* 23 Sw.L.J. 585, 589 (1969); Note, 23 Vand.L. Rev., *supra* at 30–41; Note, *The Locality Doctrine and the Standard of Care of a Physician,* 8 Washburn L.J. 339, 350–51 (1969).

Quite apart from the locality rule's irrelevance to contemporary medical practice, the doctrine is also objectionable because it tends to immunize doctors from communities where medical practice is generally below that which exists in other communities from malpractice liability. *See Shilkret v. Annapolis Emergency Hospital Association, supra* 276 Md. at 193–94, 349 A.2d at 249; *Brune v. Belinkoff,* 354 Mass. 102, 108–09, 235 N.E.2d 793, 798 (1968); *Pederson v. Dumonchel,* 72 Wash.2d 73, 78, 431 P.2d 973, 977 (1967). *See also* Waltz, *supra* at 441. Rather than encouraging medical practitioners to elevate the quality of care and treatment of patients to that existing in other communities, the doctrine may serve to foster substandard care, by testing the conduct of medical professionals by the conduct of other medical professionals in the same community.[7]

---

**6.** As the Supreme Court of Florida observed: [The locality rule] was originally formulated when communications were slow or virtually non-existent, and . . . it has lost much of its significance today with the increasing number and excellence of medical schools, the free interchange of scientific information, and the consequent tendency to harmonize medical standards throughout the country. [*Montgomery v. Story,* 84 So.2d 34, 39–40 (Fla.1955).]

**7.** Application of the locality rule has also created a number of practical difficulties. Like lawyers, doctors are reluctant to testify against members of their profession. *See Christie v. Callahan, supra* 75 U.S.App.D.C. at 136, 124 F.2d at 828; *Sampson v. Veenbee,* 252 Mich. 660, 667, 234 N.W. 170, 172 (1931); *Carborne v. Warburton,* 11 N.J. 418, 427–28, 94 A.2d 680, 684–85 (1953). Because of this so-called "conspiracy of silence," finding medical experts in the plaintiffs' locality willing to testify against a fellow practitioner is often extremely difficult. *See generally* D. Seidelson, *Medical Malpractice Cases and the Reluctant Expert,* 158 Cath.U.L.Rev. 158 (1966); Note, *Malpractice and Medical Testimony,* 77 Harv.L.Rev. 333 (1963); Comment, *Medical Malpractice Expert Testimony,* 60 Nw.U.L.Rev. 834 (1966). As Judge Skelly Wright has noted:

> Before the plaintiff-patient can recover, he must show that his injury resulted from his doctor's failure to exercise that degree of care and skill exercised by a doctor practicing in the same specialty in his locality. In mounting such proof, the plaintiff must prove by testimony from the defendant's own professional colleagues what the degree of care and skill in the area is and that the defendant failed to exercise such care and skill. The human instinct for self-preservation being what it is, there is often disclosed in the trial

The locality rule is peculiar to medical malpractice. Architects are not held to a standard of conduct exercised by other architects in the District or a similar locality. *See, e. g., Noble v. Worthy,* D.C.App., 378 A.2d 674, 676 (1977) (architects held to a national standard of care). Moreover, the conduct of lawyers is not measured solely by the conduct of other lawyers in the District or a similar community. *See Niosi v. Aiello, supra. See generally* Wade, *The Attorney's Liability for Negligence,* 12 Vand.L.Rev. 755, 762–63 (1959).

Despite these criticisms, the locality rule is still followed in several jurisdictions. *See, e. g., Levett v. Etkind,* 158 Conn. 567, 573, 265 A.2d 70 (1969); *Gandora v. Wilson,* 85 N.M. 161, 163, 509 P.2d 1356, 1358 (1973). The majority of jurisdictions, however, have abandoned the locality rule. *See* Waltz, *supra* at 411–15; 37 Annot., A.L.R.3d 420 (1971).

Courts which have abandoned the locality rule have taken different approaches in defining the geographical boundary within which the conduct of a medical practitioner is to be measured. For example, a number of courts have modified the locality rule by extending the geographical reference group of the standard of care to include that of "the same or similar localities." *See, e. g., Sinz v. Owens,* 33 Cal.2d 749, 756–57, 205 P.2d 3, 7–8 (1949); *McGulpin v. Bessmer,* 241 Iowa 1119, 1131, 43 N.W.2d 121, 126 (1950); *Karrigan v. Nazareth Convent & Academy, Inc.,* 212 Kan. 44, 49–50, 510 P.2d 190, 195 (1973); *Mecham v. McLeay,* 193 Neb. 457, 461, 227 N.W.2d 829, 832 (1975); *Wigins v. Diver,* 276 N.C. 134, 140–41, 171 S.E.2d 393, 397–98 (1970); *Runyon v. Reid,* 510 P.2d 943, 950 (Okl.1973); *Incollingo v. Ewing,* 444 Pa. 263, 274, 282 A.2d 206, 214 n. 5 (1971); *Swan v. Lamb,* 584 P.2d 814, 818 (Utah 1978); *Hundley v. Martinez,* 151 W.Va. 977, 995, 158 S.E.2d 159, 169 (1967).

This approach has been criticized because of the difficulty in determining whether two communities are similar. *See Robbins v. Footer, supra* 179 U.S.App.D.C. at 394, 553 F.2d at 128; *Shilkret v. Annapolis Emergency Hospital Association, supra* 276 Md. at 196, 349 A.2d at 250. In addition, the similar locality formulation has been criticized for containing the same deficiencies as the traditional locality rule, *i. e.,* if the standard of conduct in a similar community is substandard, the similar locality rule would immunize those medical professionals whose conduct conforms to the substandard medical practice in a similar community. *Shilkret v. Annapolis Emergency Hospital Association, supra* 276 Md. at 196, 349 A.2d at 250; *Hirschberg v. State,* 91 Misc.2d 590, 596–97, 398 N.Y.S.2d 470, 474 (1972). *See generally* Note, 23 Vand.L.Rev., *supra* at 732.

Other courts, noting that medical standards have been nationalized largely through a system of national board certification, have adopted a national standard of care, and accordingly have eliminated any reference to a geographically defined area in their formulation of the standard of care applicable to medical professionals. *E. g., Robbins v. Footer supra* (applying national standard of care to board certified specialist in the federal courts of this jurisdiction); *Kronke v. Danielson,* 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972) (specialist); *Blair v. Eblen,* 461 S.W.2d 370, 372–73 (Ky.1970) (general practitioners); *Ardoin v. Hartford Accident & Indemnity Co.,* 360 So.2d 1331, 1340 (La.1978) (specialist); *Brune v. Belinkoff, supra* (specialist, dictum general practitioners); *Naccarato v. Grob,* 384 Mich. 248, 254, 180 N.W.2d 788, 791 (1970) (specialist); *Belk v. Sweizer,* 268 N.C. 50, 56, 149 S.E.2d 565, 569 (1966) (specialist); *Orcutt v. Miller,* 595 P.2d 1191 (Nev.1979) (specialist); *Shilkret v. Annapolis Emergency Hospital Association, supra* (general practitioners and hospitals); *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 346 N.E.2d 673, 679 (1976) (specialist); *Pederson v. Dumanchel, supra* (general practitioners, hospitals);

---

of these cases what has been referred to as the conspiracy of silence—the refusal on the part of members of the profession to testify against one of their own for fear that one day they, too, may be defendants in a malpractice case. [*Brown v. Keaveny, supra* 117 U.S. App.D.C. at 118, 326 F.2d at 661 (Skelly Wright, J., dissenting).]

*Shier v. Freedman,* 58 Wis.2d 269, 283–84, 206 N.W.2d 166, 174 (1973) (general practitioners, specialist, dentist); *Dicksenson v. Milliard,* 175 N.W.2d 588, 596 (Iowa 1970) (hospitals). The import of these decisions is that health care professionals who are trained according to national standards and who hold themselves out to the public as such, should be held to a national standard of care.

■ We are in general agreement with those courts which have adopted a national standard of care. Varying geographical standards of care are no longer valid in view of the uniform standards of proficiency established by national board certification. Moreover, the tremendous resources available in the District for medical professionals keep them abreast of advances in the care and treatment of patients that occur in all parts of the country. More importantly, residents of the District desirous of medical treatment do not rely upon a medical professional's conforming to the standard of care practiced in the District or in a similar locality. Rather, they rely upon his training, certification, and proficiency. "Negligence cannot be excused on the ground that others in the same [or similar locality] practice the same kind of negligence." *Pederson v. Dumanchel, supra* 72 Wash.2d at 78, 431 P.2d at 977. Substandard practice is substandard whether it is followed in the same or in a similar community.

Although we have found no cases which address the issue of the standard of care applicable to a clinical laboratory, the same reasons which justify the application of a national standard of care to physicians and hospitals appear to apply with equal validity to medical laboratories. Medical laboratories are often staffed and operated by doctors who undergo the same rigorous training as other physicians. The opportunities for keeping abreast of medical advances that are available to doctors are equally available to clinical laboratories. Indeed medical laboratories are often an integral part of a hospital. *See generally* D. Mills, *Malpractice and the Clinical Labo-*

*ratory,* Fifteenth Ann. Avd. Institute (1965). Moreover, clinical laboratories generally conduct many of the routine tests that would normally be performed by physicians and hospitals. Accordingly, they owe similar duties in their care and treatment of patients. *See* Personal Injury Actions, Defense, Damages, Negligence, § 4.01[3].

■ Thus we hold that at least as to board certified physicians, hospitals, medical laboratories, and other health care providers, the standard of care is to be measured by the national standard. It follows that an instruction which compares a nationally certified medical professional's conduct exclusively with the standard of care in the District or a similar community is erroneous.

■ In the present case, appellees concede that they are a nationally certified medical laboratory and that they hold themselves out to the public as such. Appellant's expert witness testified at trial that the proper procedure to be employed in conducting a urethral smear test, according to national standards, is with the patient in a sitting or prone position. Appellees' expert witnesses who were all from the Washington metropolitan area testified that they were not aware of any national standards for conducting the test and that they always conducted the test with the patient in a standing position. However, the trial court instructed the jury that the appellees' conduct is to be compared solely with the standard of care prevailing in Washington, D.C. Thus, in effect the jury was instructed to ignore the testimony of appellant's expert witness on the standard of care. This instruction was error. The conflict in expert testimony was for the jury to resolve. Accordingly, we vacate the judgment in favor of appellees and order a new trial.

III

ASSUMPTION OF RISK

■ The common law defense of assumption of risk appears to have had its genesis in master-servant cases. *See, e. g.,*

*Fidelity Storage Co. v. Hopkins*, 44 App. D.C. 230 (1915); *Decatur v. Chas. H. Tompkins Co.*, 58 App.D.C. 102, 25 F.2d 526 (1928); *Baker v. Sterrett Operating Service, Inc.*, 59 App.D.C. 278, 40 F.2d 790 (1930). *See generally* Prosser, *supra* § 68, at 439 n. 9. Under this early application of the doctrine, it was generally held that if an employee entered into a contractual relationship with his employer with full knowledge of the dangerous conditions associated with his employment, the employee should be held to have assumed the risks of those dangers incident to his employment. *See Casper v. Barber & Ross Co.*, 109 U.S.App. D.C. 395, 400, 288 F.2d 379, 384 (1961). *See also Butler v. Frazee*, 25 App.D.C. 392 (1905); *aff'd*, 211 U.S. 459, 29 S.Ct. 136, 53 L.Ed. 281 (1908). The doctrine is no longer exclusively invoked in master-servant cases and it is now well-settled that assumption of risk is an affirmative defense in all negligence actions and if properly invoked, it may operate as a complete bar to liability. *See, e. g., Willis v. Stewart*, D.C.App., 190 A.2d 814, 817–18 (1963); *Smith v. John B. Kelley, Inc.*, 107 U.S.App.D.C. 140, 275 F.2d 169 (1960); *Quisenberry v. Herman*, 100 U.S.App.D.C. 145, 243 F.2d 250 (1957).

A review of the case law in this jurisdiction reveals that the defense has two analytically distinct applications. In one context, the defense refers to those situations where "the person charged [with negligence] has no duty to protect the other from [a particular] risk." *Dougherty v. Chas. Tompkins Co.*, 99 U.S.App.D.C. 348, 350, 240 F.2d 34, 36 (1957), *quoted in Kanelos v. Kettler*, 132 U.S.App.D.C. 133, 137, 406 F.2d 951, 955 (1968).[8] This use of the doctrine has been referred to as assumption of risk in its primary sense. *See* James, *Assumption of Risk*, 61 Yale L.J. 141, 142 (1952). When thus applied, the defense operates in much the same way as the doctrine of informed consent, thereby relieving

the party charged with negligence from any liability from otherwise prohibited conduct. *See generally* Mansfield, *Informed Choice in the Law of Torts*, 22 La.L.Rev. 17 (1961).

The defense has also been applied in situations where a plaintiff who is aware of the risk created by the defendant's negligence, deliberately chooses to encounter that risk. *See, e. g., Willis v. Stewart, supra* ; *Webber v. Eaton*, 82 U.S.App.D.C. 66, 160 F.2d 577 (1947). This has been referred to as assumption of risk in its secondary sense. *See* James, *supra* at 141. *See also* Prosser, *supra*, § 68 at 440. When utilized in these circumstances, the defense of assumption of risk is closely related to the defense of contributory negligence. *See Webber v. Eaton, supra* 82 U.S.App.D.C. at 67, 160 F.2d at 577.[9] Nevertheless, we have consistently maintained that the two defenses are separate and distinct; the inquiry into assumption of risk focuses on what the plaintiff in fact knew, while the defense of contributory negligence requires a determination of what the plaintiff should have known and acted upon in the exercise of reasonable care for his own safety. *See Harris v. Plummer*, D.C.App., 190 A.2d 98, 100 (1963); *Webber v. Eaton, supra* 82 U.S. App.D.C. at 67–68, 160 F.2d at 578–79.

Whether assumption of risk is used in its primary or secondary sense, the essential elements of the defense remain the same: "first, knowledge of the danger and second, a voluntary exposure to that known danger." *Dougherty v. Chas. Tompkins Co., supra* 99 U.S.App.D.C. at 349–50, 240 F.2d at 35–36. In this vein, we have emphasized that evidence merely tending to show that the plaintiff was aware of the risk is insufficient to sustain a jury finding that the plaintiff assumed the risk. *See Harris v. Plummer, supra* 190 A.2d at 100. Rather, the evidence must show that the

**8.** The duty may be imposed by statute, *see Martin v. George Hyman Construction Co.*, D.C.App., 395 A.2d 63, 71 (1978), or by law, *see Willis v. Stewart, supra.*

**9.** The varying applications of the doctrine have generated considerable debate among scholars

over its continued vitality as a doctrine analytically distinct from contributory negligence. *See generally* F. James, *Assumption of Risk: Unhappy Reincarnation*, 78 Yale L.J. 185 (1968).

plaintiff possessed full comprehension and appreciation of the danger. *See Willis v. Stewart, supra,* 190 A.2d at 817–18. *See also* Restatement (Second) Torts § 496 E, Comment (a) (1965). For "[r]isks . . . are assumed, not simply because they inhere in the situation out of which the claimant's injury arises, but because the claimant, with knowledge of the risk and full appreciation of its dangers, is willing to accept and gamble on it." *Kanelos v. Kettler, supra,* 132 U.S.App.D.C. at 137, 406 F.2d at 955. Clearly the knowledge requirement is not susceptible of mechanical application, but often requires an analysis of such complex factors as the plaintiff's age, intelligence, and experience. *See Butler v. Frazee, supra,* 211 U.S. at 465–66, 29 S.Ct. 136; *M. J. Uline, Inc. v. Neely,* 103 App.D.C. 131, 255 F.2d 540 (1958). *See generally* Prosser, *supra,* § 68, at 447–48. Simply stated, a plaintiff who through inexperience or immaturity fails to fully comprehend a risk, may not be held to the same level of understanding as a plaintiff who has superior intelligence or experience. *See, e. g., Green v. Watts,* 21 Cal.App.2d 103, 26 Cal.Rptr. 334 (1962); *Aldes v. St. Paul Baseball Club,* 251 Minn. 440, 88 N.W.2d 103 (1958).

 Even where there is evidence which tends to show that a plaintiff possessed sufficient comprehension of the risk, the defense will be unavailable unless there is evidence that the plaintiff's acquiescence in that risk was voluntary. *See Martin v. George Hyman Construction Co.,* D.C.App., 395 A.2d 63, 71 (1978); *Kanelos v. Kettler, supra,* 132 U.S.App.D.C. at 137, 406 F.2d at 955; *Dougherty v. Chas. Tompkins Co., supra,* 99 U.S.App.D.C. at 350, 240 F.2d at 36. In the words of the Restatement:

> The plaintiff's acceptance of the risk is not to be regarded as voluntary where the defendant's tortious conduct has forced upon him a choice of two courses of conduct which leaves him no reasona-

ble alternative to taking his chances. A defendant who by his own wrong has compelled the plaintiff to choose between two evils cannot be permitted to say that the plaintiff is barred from recovery because he has made the choice. [Restatement (Second) of Torts, *supra* § 496 E, Comment c.]

In sum, the principle elements of the defense are an actual knowledge and comprehension of a danger caused by the defendant's negligence and the plaintiff's voluntary exposure to that known danger.

 Although the defense of assumption of risk has been applied in a wide variety of circumstances to defeat negligence claims, the defense has rarely been sustained in actions involving professional negligence. Most courts and commentators have explained this phenomenon by quite properly noting that the disparity in knowledge between professionals and their clientele generally precludes recipients of professional services from knowing whether a professional's conduct is in fact negligent. *See Largess v. Tatem,* 130 Vt. 271, 280, 291 A.2d 398, 403 (1972). *Cf. O'Neal v. State,* 66 Misc.2d 936, 323 N.Y.S.2d 56, 61 (1971); *Martineau v. Nelson,* 311 Minn. 92, 247 N.W.2d 409, 417 (1976) (contributory negligence). *See generally* D. Louisell & H. Williams, Medical Malpractice § 9.02 (1977); D. Harney, Medical Malpractice, § 7.2 at 243 (1973); R. Mallen & V. Levett, Legal Malpractice § 173 at 226 (1977).[10] In the context of medical malpractice, the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, *i. e.,* knowledge and appreciation of the risk. Thus, save for exceptional circumstances, a patient cannot assume the risk of negligent

---

**10.** As Mallen & Levett note with respect to assumption of risk in the context of legal malpractice:

> The keystone of the defense is both comprehension and wilful assumption of risk. How-

ever, since law and legal tactics are often inscrutable to clients, it is not surprising that there are few instances where a client may properly be charged with assuming the risk of the attorney's negligence. *Id.*

treatment. *See Hales v. Raines,* 162 Mo. App. 46, 141 S.W. 917 (1911).[11]

Moreover, the nature of the doctor-patient relationship, which requires the patient to rely on the learning and judgment of the doctors, often precludes a finding that the doctor owed no duty to the patient. Clearly, because of the doctor's ability to understand and interpret medical matters, the doctor generally owes a greater duty to his patient than the patient owes to himself. *See Martineau v. Nelson, supra,* 247 N.W.2d at 417; *Largess v. Tatem, supra* 130 Vt. at 280, 291 A.2d at 403. *See also* Note, 21 Clev.St.L.Rev. 58, 59 (1972); Note, 12 Clev.-Mar.L.Rev. 455 (1963). As one court has stated:

> Patients desirous of obtaining medical attention are not responsible for diagnosing their own ailments. They assist the doctor by describing their complaints and it is incumbent upon the trained and skilled physician to isolate the nature of the patient's illness within a reasonable degree of medical certainty. [*O'Neal v. State, supra,* 323 N.Y.S.2d at 61.]

Because of the considerable duty that the doctor owes the patient, proof of the patient's knowledge is the *sine qua non* of the defense of assumption of the risk in medical malpractice. Accordingly, in the few decisions in which the defense has been sustained, the patient was specifically warned about a risk, and refused to follow the doctor's instructions. *See, e. g., Levett v. Etkind, supra* (patient who refused assistance in disrobing and subsequently fell assumed the risk); *Deblanc v. Southern Baptist Hospital,* 207 So.2d 868 (La.App.1968) (patient specifically warned not to leave bed without assistance assumed the risk of falling); *Munson v. Bishop Clarkson Memorial Hospital,* 186 Neb. 778, 186 N.W.2d 492 (1971) (patient who was repeatedly warned not to leave bed without assistance assumed the risk of falling).

While a patient's comprehension of the risk appears to be the crucial element of the defense in medical malpractice cases, it is by no means dispositive since a defendant must also show that the plaintiff's acquiescence in that risk was voluntary. *See King v. Solomon,* 323 Mass. 326, 81 N.E.2d 838 (1948); *Los Alamos Medical Center v. Coe,* 58 N.M. 686, 275 P.2d 175 (1954). It follows that the mere fact that the plaintiff requested a particular treatment is not sufficient to satisfy the requirement of voluntary consent. *See* Louisell & Williams, *supra* § 9.02, at 243 n. 15. The defendant must show that his assent to the patient's request in a particular treatment is consistent with the proper exercise of medical judgment.

Typically, the determination as to whether or not a plaintiff assumed the risk is a question of fact usually to be determined by the jury under proper instruction from the court. *Willis v. Stewart, supra* at 818. *See* Restatement (Second) Torts, *supra* § 496 D, at 595 (1965); Prosser, *supra* § 68, at 477. Where, however, there is no evidence from which a reasonable juror could find that the plaintiff assumed the risk, the question is one of law for the court. *See Harris v. Plummer, supra* at 100; *Aylor v. Intercounty Construction Corp.,* 127 U.S.App.D.C. 151, 155, 381 F.2d 930, 934 (1967); *Capital Transit Co. v. Bingman,* 94 U.S.App.D.C. 75, 76, 212 F.2d 241, 242 (1954). In our view this is such a case.

The record is devoid of any evidence indicating that appellant was aware of any risk associated with the test. Even if a jury could reasonably conclude that he recognized the causal connection between the test and his feeling of faintness, there was no evidence that he did not properly rely upon the expertise of the technician in concluding that if he felt better, the faintness was only temporary and that the test could safely proceed. Since the *sine qua non* of the doctrine is the voluntary assumption of *known* risk, it was error for this issue to go to the jury.

*Reversed.*

---

11. These same principles are equally valid with respect to the defense of contributory negligence in medical malpractice. *See generally* Note, 21 Clev.St.L.Rev. 58 (1972).