Lewis F. **LIPNICK, et al., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 87-2747.**

United States District Court,
District of Columbia.

July 19, 1989.

against defendant United States of America. A two-day trial of this matter was held before the Court on July 10 and 11, 1989. Having carefully considered all of the testimony and evidence presented, as well as the entire record herein, judgment will be entered in favor of plaintiffs.

## I. Background

In 1964 Congress authorized the creation of the John F. Kennedy Center for the Performing Arts as "the sole national memorial to the late John Fitzgerald Kennedy within the city of Washington [D.C.] and its environs." 20 U.S.C. § 76q. The memorial, more commonly known as the Kennedy Center, was built on lands acquired by the National Capital Planning Commission, *id.* § 76i, and is administered by a Board of Trustees appointed by the President and located within the Smithsonian Institution. *Id.* § 76h(a). The National Park Service, a component of the Department of Interior, is responsible for providing "maintenance, security, information, interpretation, janitorial and all other services necessary." *Id.* § 76l (e).

In addition to its commemorative function, the Kennedy Center also serves as a center for the presentation of performances in music, opera, drama, dance and poetry. 20 U.S.C. § 76j(a)(1). One group that frequently appears at the Kennedy Center is the National Symphony Orchestra (NSO), a world-renowned classical music orchestra. The NSO has leased space at the Kennedy Center since approximately 1971.

Lewis F. Lipnick, who is now 43 years old, has been a member of the NSO for 19 years and presently is the orchestra's contrabassoonist and one of its bassoonists. At approximately 9:00 a.m. on the morning of May 29, 1986, Mr. Lipnick arrived at the Kennedy Center for an NSO rehearsal. After parking his car on the "B" level of the Kennedy Center's parking garage,[1] Lipnick approached a door that had been designated for use by NSO musicians which led upstairs to the NSO backstage and rehearsal areas. As described by numer-

Nicholas D. Dale, Bethesda, Md., for plaintiffs.

Charles F. Flynn, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs Lewis F. Lipnick and Lynn–Jane Lipnick brought this negligence action

1. There are three parking levels at the Kennedy Center; the "B" level is the middle one.

ous witnesses and in several exhibits introduced into evidence, the door in question is a heavy metal fire door which (when viewed from the garage) has hinges on the left, a handle on the right and swings open towards the garage. On the back side of the door is a "crash" or "panic" bar that NSO employees had to push in order to leave the building and enter the garage. In front of the door is a concrete step which extends approximately two feet from the door and approximately six to eight inches above the floor of the garage. The door is operated by an electronic card reader which is located approximately two feet to the right of the door and is recessed some 12 inches behind the plane of the door. A concrete beam extends at right angles to the door and hangs down from the ceiling below the top of the door.

According to his unrebutted testimony, Mr. Lipnick approached the door and put a black bag and his bassoon on the ground nearby. He then placed his card into the card reader and pulled the door handle. The door did not open. Lipnick inserted his card and pulled two more times, but the door still would not open. On the fourth try, he succeeded in pulling the door free. When the door "cut loose" on that pull, however, Lipnick lost his balance, got his hand tangled in the handle, and was pulled toward the door as it swung to the left. He remembers hearing a loud crash and then feeling pain as he was hit by the door. Lipnick then recalls seeing Marcia Gittinger, the NSO's music librarian, appear and lead him upstairs. He was taken to the hospital, treated for a concussion and released.

Lipnick and his wife Lynn–Jane Lipnick [2] commenced this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 et seq., against the United States of America claiming that the doorway, door and card reader system were "negligently de-

signed, installed, maintained and operated." Complaint ¶ 10.[3] After a period of discovery, the parties participated in a settlement conference before the Magistrate and pretrial conference before the Court. The trial commenced on July 10, 1989.

## II. Discussion

■ A district court in an FTCA case is bound to apply the law of the state in which the alleged negligent act or omission occurred. *Beattie v. United States*, 756 F.2d 91, 104 (D.C.Cir.1985). The incident in the instant case took place in the District of Columbia, where the elements of negligence are "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984). To these considerations the Court now turns.

### A. Duty of Care

■ An individual is liable to another only when he owes him some duty of care. Because, however, negligence law "is founded upon the notion of the actor's culpability ... and the belief that he could have, and should have, taken steps to avoid the potential injury," *Munson v. Otis*, 396 A.2d 994, 996 (D.C.1979), a duty of care will only arise with respect to a condition that poses an "unreasonably great risk of harm." *Westinghouse Electric Corporation v. Nutt*, 407 A.2d 606, 609 (D.C.1979) (quoting Restatement of Torts § 282 (1965)). Thus, "[t]he legal duty is not to avoid all risk of injury possibly resulting from one's actions (or omissions), but only the unreasonable risk." *Munson*, 396 A.2d at 996; *see also Nutt*, 407 A.2d at 609–10 ("liability is imposed only for the creation of an unreasonable danger").

---

**2.** For convenience, the Court will refer to Mr. and Mrs. Lipnick jointly as "plaintiff" or "Lipnick" unless otherwise noted.

**3.** Federal regulations provide that actions against the Smithsonian Institution, and specifically those which involve the Kennedy Center, are within the purview of the FTCA. *See* 36

C.F.R. § 530.1(c); Answer of the United States at 2.

Plaintiff also brought this suit against Rusco Electronics Corporation, the manufacturer of the card reader system, but that defendant was dismissed by Order dated April 19, 1988.

Lipnick raised two bases for his claim of negligence. He asserted that the design of the door and card reader system posed an unreasonable risk of danger because, in order to open the door, he was required to stand with one foot on the step and one foot on the floor of the garage, simultaneously use his right hand to insert his card and his left to open the door with his body stretched out in an awkward position, and pull the door quickly because the latch mechanism on the door only allowed it to remain open for one and a half to two seconds before closing again. Plaintiff also alleged that an unreasonable risk of harm was presented by the maintenance and operation of the door, which he contends was frequently stuck and did not have a proper "stopping" mechanism to prevent it from hitting the overhanging concrete abutment. The United States countered by arguing that no unreasonable risk of harm was presented by the door or card reader. The evidence presented at trial, however, demonstrated that the maintenance and operation of the door posed an unreasonable danger to all of its users, including plaintiff.[4]

Plaintiff and all of the witnesses who used the door in question indicated that it frequently did not operate properly during the time leading up to plaintiff's accident. The most serious problem encountered was that the door often stuck in the door frame. When this happened, it became necessary to pull the door harder to attempt to dislodge it from the frame. NSO employees testified at trial that the door could often only be opened with "a good, healthy jerk," "considerable force," or "an extremely strong tug." Robert Kraft noted that the door was sometimes "extremely difficult" to pry open, while Richard White stated that at times the door was "difficult if not impossible" to unstick. White also noted that occasionally he could not exit this fire door from the Kennedy Center into the garage because of the jamming. The condition of the door varied greatly from time to time. Sometimes the door would open easily and one pull would suffice. At other times, it became necessary to make several additional attempts in order to dislodge the door. Weeks or months would pass when the door would not open correctly, followed by a substantial period of time in which no problems would occur. One witness, Marcia Gittinger, summed up the matter quite succinctly when she stated that the door was "consistently inconsistent."

A stuck door is not by itself, of course, unreasonably dangerous. Several other factors, coupled with the severe jamming problem, nonetheless convince the Court that an unreasonable risk of harm existed here. For one thing, plaintiff and the other NSO employees stressed that the door was heavy. The electronic card reader was also inconsistent in operation, frequently requiring several card insertions and pulls before the door latch would click open. The position of the concrete beam is also problematical. As several witnesses related, the beam was virtually at right angles to the door and hangs down below the top of the door. *See also* Plaintiffs' Exhibits (Pl.Exs.) 11, 12f, 12g. This meant that the door could only open approximately 90 degrees before its arc would be impeded by the abutment. Finally, there is a "stopper" at the top of the garage-side of the door, *see* Pls.Ex. 12a, 12f, but the stopper was not set in such a fashion to prevent the door from hitting the beam. Ms. Gittinger, whose office is located almost directly above the door, noted that she often heard the door hitting against the beam while she worked.

The question of unreasonable risk is often stated as one of foreseeability. *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C.1980) ("Foreseeability of particular conduct is a relevant factor in determining the nature of the risk and the standard of conduct"). The risk of harm from operation of this door was foreseeable. The situation that existed at the time of the accident was as follows: a heavy metal door located at right angles to a concrete beam was frequently jamming, causing the users to pull the door quite hard in order to

---

**4.** Because of this conclusion, the Court does not (and need not) reach plaintiff's alternative contention concerning the design of the door and card reader system.

open it. Knowing these facts, one could surely foresee that the door would be pulled hard enough to rebound off the beam and strike someone attempting to enter the door. Or, one could foresee that the person attempting to open the door might pull it and hit himself directly without the door rebounding off the beam. Additionally, because the door was used as a fire door, and in view of its chronically-inconsistent jamming, one could also readily foresee that, in the unfortunate event of a fire, the door might well stick (as it had in the past) and prevent NSO employees (or anyone else) from exiting into the garage. All or any of these eventualities should have been apparent to one with knowledge of the situation that existed with respect to the door.[5]

In addition to foreseeability, a plaintiff must also demonstrate that the negligent party had actual or constructive notice of the existing hazard. *Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C.1982). In this case both forms of notice were given. There was unrebutted testimony that one year prior to the incident Lipnick informed several members of the National Park Service that the door was malfunctioning. Ms. Gittinger related that she telephoned the Park Service a half dozen times to report her difficulties with the door. Edwin Johonnott, an NSO musician who was on a committee dealing with musician parking, recounted a meeting with two Park Service officials concerning the door situation in early May 1986—just weeks prior to Mr. Lipnick's accident. Johonnott related that he had been "harassed" by the Park Service officials because NSO employees were propping the fire door open with sticks and cans and were holding the door open for each other. There was also testimony that work crews appeared at the door from time to time, although the nature and extent of their efforts were not revealed.

There is no doubt that defendant had actual notice of the problems caused by the door.

Nonetheless, had actual notice been lacking in some way, defendant should have known of the situation that existed. To find constructive notice, "the cause of the injury must be foreseeable" and "the cause must have been present in the area where the injury occurred for a sufficient length of time that the property owner should have known about it." *Marinopoliski*, 445 A.2d at 341. As noted above, the cause of this accident was foreseeable. And there was ample testimony from Lipnick and from other long-time NSO employees that the door had been malfunctioning for several years prior to Lipnick's accident. Without question, defendant had constructive notice of the unreasonable risk of danger that existed.

In sum, because the combination of circumstances existing at the door posed an unreasonable risk of danger, because defendant had notice of the condition, and because plaintiff had been designated to use *this* door for entry and exit, the Court finds that defendant United States owed plaintiff Lipnick a duty of care.

### B. Breach

Before considering whether a breach occurred, the Court must ask what duty was owed by the defendant to the plaintiff. In the District of Columbia this standard "is often stated as 'that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances.'" *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C.1979) (quoting *Washington Hospital Center v. Butler*, 384 F.2d 331, 335 (D.C.Cir.1967)). *See also Sinai v. Polinger Co.*, 498 A.2d 520, 529 (D.C. 1985).[6] In this instance the United States

---

5. In the District of Columbia "'the defendant need not have foreseen the precise injury, nor "should [he] have had notice of the particular method" in which a harm would occur.'" *Lacy*, 424 A.2d at 323 (quoting *Kendall v. Gore Properties, Inc.*, 236 F.2d 673, 682 (D.C.Cir.1956) (footnote omitted)); *see also Bell v. Jones*, 523 A.2d 982, 995 (D.C.1987) (citing *Kendall*).

6. Since Lipnick was an invitee—"a person whose presence on the land was beneficial to both the owner and the user," *Nelson v. United States*, 838 F.2d 1280, 1285 (D.C.Cir.1988)—the United States was required to "exercise ordinary care and prudence to render the premises reasonably safe and to discover dangerous condi-

did not exercise the requisite level of care. Knowing the situation that existed with the door, a reasonably prudent person would have promptly rectified the danger in any number of ways: fixing the door to prevent it from jamming; replacing the door with one that would not jam; setting the door stopper to prevent it from hitting the concrete beam; or placing some device on the beam to absorb the impact of the blow caused by the door. Although Robert Kraft testified (without elaboration) that he saw some workmen at the door, there is no evidence that any of these measures were ever taken. And even had some of these measures been taken, they clearly did not rectify the persistent danger. Defendant did not exercise reasonable care under the circumstances presented and therefore breached the duty of care that it owed to plaintiff Lipnick.

In addition to contesting negligence, the United States raised two affirmative defenses. It first contended that Lipnick was guilty of contributory negligence, which operates as a complete bar to recovery in the District of Columbia. *Wingfield v. Peoples Drug Store*, 379 A.2d 685, 687 (D.C.1977). Contributory negligence is " 'the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances.' " *Jeffries v. Potomac Development Corp.*, 822 F.2d 87, 91 (D.C.Cir.1987) (quoting *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C.1985)). As one ground for contributory negligence, defendant argued that Lipnick should have used another stairway to the rehearsal area when the door was stuck. The evidence presented rebutted this contention. For one thing, the alternative route—which would have taken plaintiff through the main entrance to the Kennedy Center—was quite circuitous; it would have required Lipnick (carrying a cumbersome instrument) to walk across the garage, climb a steep embankment, proceed around to the front of the Kennedy Center, and then gain access to the rehearsal area through a different doorway.[7] In addition to this inconvenience, the alternative route also posed its own risks. Richard White (who had taken this route) stated that the embankment was a "hard climb" when the weather was snowy or otherwise inclement and that the front entrance to the Kennedy Center had several large marble squares that frequently became very slippery when they were wet.[8] Mr. White and Lawrence Bocaner also related another problem particular to musicians: that, when they carried their instruments over this long route, their hands and fingers often became sore and sensitive and their playing was adversely affected. Finally, it is important to emphasize that, even though Lipnick was using a door that often (and inconsistently) was stuck, that door had been *designated* as *the* entrance to be used by NSO employees and those employees had been given security cards to allow them—and only them—to enter that door. For all of these reasons, plaintiff did not act unreasonably when he used that door.

Counsel for defendant also asserted in closing argument that contributory negligence existed because plaintiff's injury was "self-inflicted." In essence, the United States contended that Lipnick pulled the door too hard when he attempted to get it open. The evidence presented, however, simply does not support this speculation. Plaintiff Lipnick testified that, after each unsuccessful attempt to open the door, he pulled it "a little harder" each time until it finally opened on the fourth try. He stated that he was not using the maximum force of which he was capable because he was awkwardly positioned, with his right hand stretching for the card reader and his left on the door. He further testified that, although he was "slightly frustrated" with

---

tions." *Id.* This test is not appreciably different from the one set forth in the text.

**7.** Although there were other doors used by the public on the "B" level, these did not open until 10:00 a.m. Plaintiff and the other musician witnesses related that, because of the need to prepare for rehearsals that usually began at 10:00 a.m., they often arrived at the Kennedy Center at approximately 9:00 a.m. (as plaintiff did on the day of his accident). The other doors were therefore not available to Lipnick on the day in question.

**8.** There was no testimony concerning the weather conditions on the day of the accident.

the situation, that reaction was no different than the feeling he had on several previous occasions when the door was stuck. Ms. Gittinger's eyewitness testimony confirms that plaintiff did not use overly-excessive force in opening the door. She stated that, on the morning in question, she was parking her car on the "B" level and saw Lipnick trying to open the door. She exited her car, approached plaintiff, and the two engaged in small talk. On the second attempt that she observed (plaintiff stated that this was his fourth try), plaintiff succeeded in opening the door. Ms. Gittinger persuasively testified that, although plaintiff gave the door a "heave-ho," the force used was not extraordinary. Moreover, she characterized Lipnick's reaction as annoyance rather than anger and observed that Lipnick did not hit the door or engage in any verbal outburst, such as swearing.[9] No undue force was used.

Ms. Gittinger also testified that, after Mr. Lipnick opened the door, she crossed the threshold, heard a loud noise ("like something dropping on cement") and turned around to see plaintiff covered with blood. Using this testimony as a launching board, counsel for the United States theorized during his closing argument that, after Ms. Gittinger crossed the doorway, the door began to swing back toward plaintiff and he pushed the door back towards the beam, thereby creating the ricochet which caused his injury. There is nothing in the record to support this speculation. Moreover, although Ms. Gittinger stated that she climbed up onto the concrete step and crossed the doorway after plaintiff opened the door, she noted that she was "barely" across the threshold (only two or three feet) when she heard the crashing noise and that only three to four seconds had elapsed between the opening of the door and the sound. That testimony is simply insufficient to draw the inference that defendant asked the Court to make. The Court cannot, and does not, find plaintiff guilty of contributory negligence.

The other defense suggested by the United States was assumption of the risk, which applies "in situations where a plaintiff who is aware of the risk created by the defendant's negligence deliberately chooses to encounter that risk." *Morrison*, 407 A.2d at 566. Although one may conclude that Lipnick should have known of the risk presented (he certainly knew that the door was sticking and should have known that it might hit the concrete beam), the defense of assumption of the risk does not apply "unless there is evidence that the plaintiff's acquiescence in that risk was voluntary." *Id.* In an oft-quoted section, *see Morrison*, 407 A.2d at 567; *Sinai*, 498 A.2d at 525, the Restatement of Torts explains that

> The existence of an alternative course of conduct which would avert the harm ... does not make the plaintiff's choice voluntary, if the alternative is one which he cannot reasonably be required to accept.

Restatement (Second) of Torts § 496E, comment c (1965). Given that (1) the door involved had been specifically designated for the NSO musicians' use and, therefore, for plaintiff's use, (2) the door worked well on some days but not on others, and (3) there were inherent problems (outlined above) in the lengthy alternative detour, the Court cannot say that plaintiff's use of the door was an unreasonable choice: the alternative, which was occasionally (but not consistently) used by some of the other musicians, is not one he could reasonably be required to accept. The assumption of risk doctrine is not applicable here.

### C. Injuries

Plaintiff Lipnick suffered injury as a result of defendant's breach of the duty it owed to him. First, plaintiff incurred medical expenses directly associated with the incident. After being struck by the door, he was taken by ambulance to the emergency room of George Washington University Hospital, where he was treated and released with stitches in his forehead. He returned to the hospital several days later

9. Plaintiff does not remember seeing Ms. Gittinger until after his accident; expert medical testimony confirmed that the blow to the head he suffered could have caused this loss of memory.

to have the stitches removed. Plaintiff's expenses for this initial transportation and treatment amounted to $287, which charges are found to be fair and reasonable.

During the first few days after the accident, Lipnick experienced a number of unpleasant conditions, including pain around the wound, severe headaches, numbness in his extremities, dizziness, memory loss and blurred vision. Within approximately eight weeks, most of these conditions had subsided. Some eight to twelve weeks after the accident, however, two problems developed and have continued to the present day. Plaintiff began to experience double vision, a condition which was constant for approximately four or five months but thereafter bothered plaintiff only when he was playing his instrument or reading. In addition, Lipnick also suffered from severe headaches on a daily basis. The headaches worsened when Lipnick played his instruments, and he described the pain he experienced as "throbbing," "intense" and "pounding." The problem was so severe that plaintiff often became nauseated and had to vomit.

In an effort to alleviate his headaches and double vision, Lipnick consulted several neurologists beginning in August 1986. Dr. Howard Silby ran a series of tests on plaintiff, including X-rays, a CAT scan, an electroencephalogram and a magnetic resonance imaging, all of which proved to be negative. Silby also placed plaintiff on a course of biofeedback and prescribed medication for him. Dr. Benjamin Frishberg was consulted at this time for Lipnick's double vision; he recommended a course of treatment that included eye "push-ups" and corrective lenses for Lipnick's glasses. Despite these visits, the headaches and double vision did not dissipate.

Thereafter, Mr. Lipnick was treated by Dr. David Satinsky, a neurologist with an interest in the medical problems of musicians. Dr. Satinsky testified that plaintiff's symptoms indicated that he was suffering from post-concussion syndrome, an indeterminate malfunctioning of the brain which frequently follows a concussion. Because of the location of the headaches in the front and sides of plaintiff's head, Dr. Satinsky concluded that plaintiff was suffering from vascular headaches, in which alterations occur in the circulation of blood in the head.[10] Dr. Satinsky prescribed a series of different medications for Lipnick. These medications helped to alleviate his daily headaches, but they had two important side effects—impotence and impairment of libido. Even with these medications, however, plaintiff still has headaches when he plays his instruments.[11] Although the headaches are less severe than they were previously, Dr. Satinsky stated that the condition (along with the double vision) will be permanent.

Plaintiff has suffered additional elements of economic harm. Lipnick was required to expend $1,828 for physician visits and $1,269 for various diagnostic tests. *See* Pls. Exs. 5–7. These amounts were necessary and appropriate. He also has expended approximately $565 for medication since he first saw Dr. Silby in August 1986.[12] Dr. Satinsky stated that, because plaintiff's headaches are permanent, he will be required to incur future medical expenses. These include $130 per year for office visits (two each year at $65 per visit) and continued medication ($200 per year). Taking judicial notice of plaintiff's life expectancy (32.2 years at the time of trial), plaintiff can reasonably be expected to incur $10,-626 in future medical expenses.

---

**10.** These are to be distinguished from headaches caused by muscle tension or spasms, which plaintiff had experienced several years before his accident. *See infra* note 17.

**11.** Dr. Satinsky explained that playing the contrabassoon causes a tremendous amount of pressure to build up in the musician's chest, thereby preventing blood from returning to the heart and causing veins and arteries in the neck and head to swell. Plaintiff testified that play-

ing the contrabassoon was not a natural activity. Robert Kraft described the contrabassoon as an "unforgiving instrument."

**12.** This figure is based on plaintiff's testimony that he spent approximately $19 to $20 dollars every five weeks on medication and on a bill for medication introduced into evidence. *See* Pls.Ex. 8.

Plaintiff has suffered other economic injury. Drs. Silby and Satinsky recommended that Lipnick halt his bassoon playing for some extended periods to see if his headaches could be extinguished; as a result, plaintiff missed four weeks of work. In addition, the severity of plaintiff's headaches also caused him to miss several rehearsals and concerts on an intermittent basis throughout 1986 and 1987. *See* Pls. Exs. 13 and 14. The amount of his wage loss was $8,051. Plaintiff also lost some business opportunities, when he could not play two concerts outside of the NSO and when he was forced to forego several jobs in his music consulting business; these losses amounted to $1,900. His past and future economic harm therefore totals $24,526.

Mr. Lipnick has also suffered further significant harm. As recounted above, his headaches are permanent and persist while engaged in his profession, playing his instruments. His double vision has not substantially improved. He has a scar on his forehead where he was struck by the door.[13] Because of his profession as a musician, these conditions have engendered additional difficulties. The headaches and double vision have made it difficult for Lipnick to concentrate during rehearsals and concerts. He has been unable to read his music at times and has missed lines of music on other occasions. When his wearing of corrective lenses brought forth an unfavorable reaction from the conductor of the NSO, plaintiff removed the glasses and then had to play with one eye closed to rectify his double vision. As a result of all of these factors, his confidence in his playing ability—the mainstay of any musician—and the quality of his playing suffered.[14] Plaintiff does not feel "like a whole person anymore"; he believes that part of him has been "cut out." For Lipnick—who was described as "unparalleled" and at "the top of his field" as a contrabassoonist—the resulting anxiety has been pervasive.[15]

In addition to his professional difficulties, plaintiff suffered distress in his personal life. After the accident, Lipnick's personality changed: he became "nasty" and "irritable." Lawrence Bocaner observed that Mr. Lipnick was "less affable," "more withdrawn" and "a different person." Mrs. Lipnick also noted that he had less stamina, tiring more easily. The Lipnicks' social life was also drastically curtailed. Prior to the accident, they went out (on average) two times weekly. In the year after the accident, however, plaintiff stated that he did "nothing" and Mrs. Lipnick observed that they attended only three or four social events.[16] Significantly, the drugs that plaintiff has taken to ease his headaches have had a deleterious affect on his sexual relations. Both plaintiff and his wife testified that, in the five years prior to the accident, they enjoyed excellent sexual relations several times each week. Afterwards, the frequency of their relations declined markedly. The couple had no sexual relations during the first year and only once a month during the last two years, and the quality of these relations has diminished since the injury.

### D. Proximate Cause

The final element of the tort of negligence is proximate causation, which exists when there is sufficient evidence presented to allow the finder of fact to conclude that "there was a direct and substantial causal

---

**13.** Plaintiff stated that he was self-conscious about the scar because of his frequent appearances before the public and that he wished to have cosmetic surgery performed at some point in the future in order to improve it. However one values this injury, it will nonetheless be permanent.

**14.** Richard White (who sits directly in front of plaintiff in the orchestra) noticed the change in plaintiff's playing on his entrances and rests. Robert Kraft observed that the compensating lenses were a "real hindrance" to Lipnick. Although other musicians testified that they did not detect any diminishment in Lipnick's performance, they all noted that this may have been due to the extraordinary quality of his art.

**15.** Finding plaintiff depressed, Dr. Satinsky referred Lipnick for psychological counseling.

**16.** Even after Lipnick began taking medication, Mrs. Lipnick stated that they only go out twice in a month.

relationship between the defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable." *Psychiatric Institute of Washington v. Allen*, 509 A.2d 619, 624 (D.C.1986) (emphasis in original). In this case, defendant's breach of the duty owed to plaintiff proximately caused foreseeable injury to plaintiff, and the damage resulting therefrom described above, as there was no other factor or intervening incident that contributed to these harms.[17]

### III. Conclusion

Plaintiff Lewis F. Lipnick is entitled to fair and reasonable compensation for the damages he has incurred, which were proximately caused by defendant's negligent breach of the duty owed to him. For the totality of his loss, he shall be awarded $180,000. In addition, plaintiff Lynn–Jane Lipnick is also entitled to damages for loss of consortium proximately caused by defendant's negligence towards Mr. Lipnick. Fair and reasonable compensation for the diminished quality of her sexual, social and emotional relations with her husband, and the overall loss of consortium, is $50,000.

A separate Judgment accompanies this Opinion.

---

**17.** Mr. Lipnick acknowledged at trial that he suffered headaches before his accident, and defendant suggested that these headaches were somehow related to the ones he encountered after being hit by the door. This contention is meritless. The former headaches had ended two or three years before the accident. Plaintiff also related that those earlier headaches were of a different kind, as they were generalized, not very intense, in a different part of his head and did not become worse when he played the bassoon. Plaintiff further explained that the early headaches had been caused by taking in too much air when he played and that they eventually disappeared when he changed his style of playing his instrument. Dr. Satinsky stated that the pre-accident symptoms plaintiff described are consistent with muscular headaches, not the vascular headaches plaintiff encountered after the incident.

In addition, although plaintiff previously suffered from vascular headaches, these had ended when he was a child. Dr. Satinsky noted that plaintiff's current headaches would not have occurred had he not been hit on the head.